## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **CAMRON SNEED** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 1:19-cv-608** |
| | § | **Jury Trial** |
| **AUSTIN INDEPENDENT SCHOOL** | § | |
| **DISTRICT,** | § | |
| **Defendant.** | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

**NOW COMES** Camron Sneed, ("the Plaintiff") and files this her *Second Amended Complaint* alleging that the Austin Independent School District (hereinafter referred to as "Austin ISD", "AISD"  or the "School District"), violated the various rights of Camron Sneed as more specifically pled herein. Plaintiff reserve the right to replead if new claims and issues arise upon further development of the facts, as permitted by law. In support thereof Plaintiff would respectfully show this tribunal the following:

## I. BRIEF INTRODUCTION TO THE CASE

1.  This is a case about an African American student, Camron Sneed, who was a victim of bullying, harassment, discrimination, and retaliation based on her race.

2.  While a student at James Bowie High School in the Austin Independent School District Camron Sneed was called and referred to by racial slurs, creating a racist and hostile educational environment where racial jokes and slurs were blatantly permitted in the classroom, clubs such as band and Future Farmers of America ("FFA") and often in the presence of teachers. Camron had her FFA equipment vandalized and animals were injured, and witnessed a stuffed object hanging from a noose in her designated FFA area.

1

These incidents took place in classrooms and the FFA area at James Bowie High School. As incidents of this type of abuse continued, Camron began to show behavioral changes, including loss of appetite, headaches, uncontrollable crying spells, stomach aches, fatigue, and insomnia. The School District knew about these incidents, as Camron's parents complained to school staff on numerous occasions.

3.   Nevertheless, the family's complaint were never investigated pursuant to federal law, rules, or executive guidelines, nor were the family's complaints ever investigated pursuant to the School District's own policies and procedures regarding allegations of bullying, harassment, and retaliation based on race. Further, the School District failed to remediate the effects of the racial harassment and bullying Camron experienced.

4.   The family feels compelled to tell their story in hopes that it will help other families who have experienced similar situations, as well as have a healing effect for both Camron and the family.

5.   As such and as will be fully described below, Plaintiff now bring forth claims pursuant to Title VI of the Civil Rights Acts of 1964, 42 U.S.C. § 2000 et seq. and the 14th Amendment to the United States Constitution.

## II. JURISDICTION

6.   Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §1331 and §1343 because the matters in controversy arise under the laws and rules of the United States as noted above.

7.   This Court also has jurisdiction to award attorney's fees and costs to the Plaintiff pursuant

to 42 U.S.C. §2000d et seq. and 42 U.S.C. §1988.

### III.   <u>VENUE</u>

8.   Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiff's claims occurred in the Western District of Texas and in the Austin Division.

### IV.   <u>PARTIES</u>

9.   Camron Sneed lives in Texas with her parents, Charles E. Sneed, Sr. and Pamela J. Parks in Austin, Texas, 78744. They live within the AISD catchment area.

10.   The Austin Independent School District is a school district organized under the laws of the State of Texas. At all times pertinent to this case, Camron was a student at the Austin Independent School District. The Austin ISD has been served and have answered the Complaint. Plaintiff are represented by their counsel of record, Jonathan Brush and May Demmler with the law firm of Morris and Grover.

### V.   <u>STATEMENT OF FACTS</u>

A.   A BRIEF HISTORY OF TITLE VI OF THE CIVIL RIGHTS ACTS OF 1974

11.   Title VI of the Civil Rights Act of 1964 provides that no person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. §2000d.[1]

12.   The Department of Justice was given authority to develop regulations on the topic. For

---

[1]. It is uncontroverted that the School District receives federal monies and must follow the requisites of Title VI.

instance, after public hearing it promulgated, *Non-discrimination in Federally Assisted Programs- Implementation of Title VI of the Civil Rights Act of 1964* notes that discrimination is prohibited in that a recipient of federal funds, like the Austin Independent School District cannot use race or nationality as a factor in denying a service or benefit[2]; or subject a person to separate treatment, or restricting [3] a student from enjoying an advantage or opportunity[4] given to another student based upon race or nationality. *See* 28 C.F.R. §42.104.

13.     Moreover, the District must provide assurances to students that they are in compliance with the law by making available to the students information about these regulations including, among other things, the complaint process and the name of the person at the School District who is designated to address concerns of discrimination based upon race. *See* 28 C.F.R. §42.106(d); §42.107; *see also* 34 C.F.R. §100.4 (the United States Department of Education, by and through its *Office of Civil Rights*, has been given authority to investigate allegations of discrimination based upon race and allegations of violations of Title VI)[5].

14.     Importantly, 28 C.F.R. Subpart F [*Coordination of Enforcement of Nondiscrimination in Federally Assisted Programs*] reiterates much of what is addressed above in Subpart C. It

---

[2]. *See also* 34 C.F.R. §100.3(b)(1)(iii).

[3]. *See also* 34 C.F.R. §100.3(b)(1)(iv).

[4]. *See also* 34 C.F.R. §100.3(b)(1)(vi).

[5]. *See* 59 Fed. Reg. (No 47) March 10, 1994 [Racial Incident and Harassment Against Students]; 68 Fed. Reg. (No. 219) 68050, November 13, 2000.

requires the School District to provide information to students about Title VI throughout the school environment, whether it be in posters, student handbooks, manuals, pamphlets, websites and other material specific information about filing complaints. 28 C.F.R. §42.405 [Public Dissemination of Title VI Information]; *see also* 34 C.F.R. §100.6(d) [Information To Beneficiaries And Participants].

15. In 1994 the DOE *Office of Civil Rights* ("OCR") produced policy guidance entitled *Racial Incidents and Harassment Against Students,* 59 Fed. Reg 47 (March 10, 1994). It set the professional standards of care for addressing harassment when based upon race. The number one item was to create a campus environment by first, training staff and by providing related supervision, so that they and the entire educational community become sensitive to related concerns regarding bullying and harassment. Among other things it noted the importance of publicizing the issue, of non-toleration of harassment based upon race, training to students, of counseling to both the victim and perpetrator, of ongoing monitoring and follow up on incidents and ongoing assessment of the school climate and policies and practices to assure effectiveness.

16. Moreover, it reiterated the importance of assuring the parents received notice of all their procedural safeguards, including notice of who the Title VI Coordinator was and the grievance procedures available, including those at the school level, state level and federal level. In addition, the District is required to explain to the family the investigatory process, notice of who is the correct staff person to address their concerns, information about the District's duty to complete an investigation in a timely and complete manner, give copies of all investigatory findings to the parent and their right to appeal.

17.    Importantly and in addition to all the above, the District has a duty to remedy the effects of the bullying and harassment a student experienced, a response tailored to the individual needs of the student and situation. It includes but is not limited to psychological testing and services, providing or paying for counseling services for the student, referral for medical and other community-based services, placing the students in different classes or environments or even removing the perpetrator from the hostile environment completely. In addition, a District may provide a one-to-one aide, social skills services, self-advocacy training and close monitoring of the victim. These professional guidelines and standards of care have been reiterated and reissued numerous times by and through the OCR in directives entitled a *"Dear Colleague Letter."*

B.    TEXAS LAW AND PROFESSIONAL STANDARDS OF CARE

18.    It is long-standing and well-settled law in Texas that educators have a duty to report abuse and neglect of a minor. *See* Texas Family Code §261.101; *see also* Texas Education Code §21.006[6]; 19 T.A.C. §61.1051. Abuse includes but is not limited to any type of conduct that causes or could cause emotional injury to a minor. Id. at §261.001(1)(A, B, E, F).

19.    In addition, School Boards were provided significant information from the *Texas Association Of School Boards* ("TASB") on how to best respond to assaults, bullying and harassment, when it occurred. In fact, in September of 2008, TASB disseminated a memorandum entitled *Harassment and Bullying Policies In Public Schools.* It noted the requirement that school's must have an active policy and practice regarding both teacher

---

[6]. This law was taken from Vernon's Civil Statutes and codified in 1995.

upon student and "student-to-student harassment."  It noted, the most recent applicable legislative changes. Among other things it noted that a school district could be liable when there is student upon student harassment and the district's "deliberately indifference cause students to undergo harassment or makes them vulnerable to it, and the harassment takes place in a context subject to the school district's control."

20.     In regard to addressing issues of assault, bullying and harassment it referred school districts in Texas to look to the U.S. Department of Education Office of Civil Rights, *Protecting Students from Harassment And Hate Crimes: A Guide For Schools*. In addition, the TASB also helped the Austin ISD to develop a number of very specific policies, procedures and practices related to bullying, harassment and assault.

21.     In 2011 the Texas Legislature again addressed bullying, harassment and sexual harassment in the public schools by passing comprehensive and far-reaching legislation on the topic. Put into the Texas Education Code, staff was required to have specialized training on the topic (Section 21.451) and that students were to be provided various types of assistance including counseling.

22.     In response to all the above, in 2012 TASB again provided School Districts in Texas guidance on addressing allegations of bullying and harassment. It promulgated updated versions of policies and procedures that a school board like the Austin ISD could adopt to address bullying and harassment, whether student upon student, teacher upon student, or both. The bulletin sent out to all Texas School Districts reiterated their duties to have a functional policy and procedure for reporting, investigating and issuing a determination regarding an allegation of bullying and harassment. It also reiterated the duty to train not

only staff but students on issues regarding bullying and harassment. It further underscored and reiterated the duty for staff to report allegations of harassment between a teacher and student to child protective services. Texas Family Code 261.101(b). It reiterated School District liability under operative caselaw, like <u>Gebser v. Lago Vista Indep. School Dist.</u>, 524 U.S. 274, 291, 118 S.Ct. 1989, 141 L. Ed. 2d 277 (1998) and <u>Davis v. Monroe County Board Of Ed.</u>, 526 U.S. 629 (1999) reliance upon and the importance of OCR Guidelines.

C.    AUSTIN ISD POLICIES AND PROCEDURES

23.    The Austin ISD has long had, and re-authorized policies and procedures related to *Student Welfare* and keeping students free from *Discrimination, Harassment & Retaliation* (FFH Local) which address, among other things, bullying, harassment, and assault.

24.    In particular, it sets out definitions of discrimination and harassment based upon race and nationality.

25.    The District has a one (1) page policy and procedure FB (LOCAL) that deals with "EQUAL EDUCATIONAL OPPORTUNITY." It notes the responsibility of the persons who handle complaints dealing sexual harassment (Tile IX Coordinator"), discrimination based upon disability (ADA/Section 504 Coordinator and that the Superintendent "serves as the coordinator for District compliance with all other non-discrimination law." Nowhere in the policy does the Board specifically what other laws, the Superintendent may be responsible for. It lets the public look to another document, FB (EXHIBIT) for further information for these coordinators. Race is not mentioned.

26.    Policy FFH (LEGAL) is one (1) page deals with "STUDENT WELFARE- FREEDOM FROM DISCRIMINATION, HARASSMENT, AND RETALIATION." It only deals

with violations of Title IX regarding sexual harassment. Race is not mentioned.

27.   FFH (REGULATION) is a thirteen (13) page policy that also deals with "STUDENT WELFARE- FREEDOM FROM DISCRIMINATION, HARASSMENT, AND RETALIATION."   It too notes that discrimination based upon race, color or nationality is prohibited, and again only on the first page. The rest of the policy addresses freedom from discrimination and is heavily weighted to discrimination based upon disability (Section 504 and the ADA) or sex. (Title IX). Like those before it, it also briefly notes that the Superintendent "serves as the coordinator for District compliance with all other non-discrimination law" but again, nowhere in the policy does the Board specifically what other laws, the Superintendent may be responsible for. Like those before it, race is not mentioned again.

28.   FFH (LOCAL) is a seven (7) page policy that also deals with "STUDENT WELFARE- FREEDOM FROM DISCRIMINATION, HARASSMENT, AND RETALIATION." It does note that discrimination based upon race, color or nationality is prohibited on the first page. The rest of the policy addresses freedom from discrimination based upon disability (Section 504 and the ADA) or sex. (Title IX). It too notes that the Superintendent "serves as the coordinator for District compliance with all other non-discrimination law." Again, nowhere in the policy does the Board specifically what other laws, the Superintendent may be responsible for. Race is not mentioned again.

29.   Notwithstanding its emphasis on disability discrimination and sexual harassment FHH (LOCAL) has sections that are applicable to discrimination based upon race.

30.   It has a section dealing with the duty to not retaliate against anyone because a complaint

has been filed on their behalf. It provides information about the reporting and investigatory process. It requires allegations of harassment based on race and nationality to be directed to the School District's Superintendent, and the family be given that person's contact information.

31.    The family also was required to receive actual notice of their procedural rights. The school District's investigation needed to be completed in a timely manner, usually less than 10 days, then a written report should be developed, and interim action taken, as appropriate. The report must address whether or not prohibited contact occurred and must be filed with the relevant School District Official. If a student is not classified with the outcome of the investigation, they have the right to appeal the decision through the District's grievance procedure or even with the Office of Civil Rights with the U.S. Department of Education. (FFH Local).

32.    The Policies also note a non-exhaustive list of potential corrective actions. They include, for instance, a training program for those involved in the complaint, counseling for the victim and even the perpetrator. There also had to be a system to follow up with the victim to assess the effectiveness of any intervention that may have been provided. There should also be, where warranted, a comprehensive education program for the school community. The district should also address increasing staff monitoring. (FFH Local).

33.    Importantly, the School Board has developed a list of required professional staff development subjects for staff. (DMA LEGAL). There are several that focus on topics of disability and sexual harassment; however, there is nothing on that list that requires staff to take any particular training on dealing with race or cultural sensitivity issues. Nor is

there is any specific training provided on what is termed "implicit bias" or "unconscious bias."

34.    The Austin Independent School District lack of policies and procedures regarding racial bias shows how they fail to make discrimination based upon race an issue of importance.

D.    ABOUT THE ASSISITANT SUPERINTENDENT POSITION

35.    Dr. Craig Shapiro is the Assistant Superintendent for all high schools within the Austin Independent School District. There are a total of twelve (12) high school in the District. Additionally, there are a number of charter and magnet schools.

36.    Dr. Shapiro is supervised by the Superintendent, Dr. Paul Cruz.

37.    Upon reason and belief, Plaintiff reasonably believe Dr. Shapiro is the Superintendent's delegee to address Title VI Complaints. He is responsible for the supervision of the Special Education Executive Director and the Multilingual Education Executive Director; he oversees the High Schools Executive Director, the high schools, the athletics and Career and Technical Education (CTE).

E.    ABOUT C.S.

38.    Camron Sneed was born in 2002. She is now seventeen (17) years old.

39.    During the period of time that makes the basis of this complaint, she was a student at James Bowie High School. She was a bright student who consistently earned high grades. Camron also participated in the FFA program at James Bowie High School, where she was the only African American student, and intends to be a Veterinarian.

F.    CAMRON SNEED'S EXPERIENCE AT THE AUSTIN ISD

           i. 2016-2017 SCHOOL YEAR

11

40. In fall of 2016 of her Freshman year, Camron began to experience bullying and harassment because of her race.

41. Camron participated in marching band where she constantly heard people use the word nigger.

42. When Ms. Parks addressed her concerns with the Band Director, she was told that the kids are just being kids.

43. On or about November of 2016, Camron went on a trip with the marching band to Indianapolis, Indiana.

44. While on the trip a fellow band member engaged in a conversation with Camron about her ethnic hair and told Camron "yall's kind of hair looks like shit."

45. In December 2016, Camron Sneed and her mother were at the farm for the High School they were surrounded by a group of white males, present and former students, who hurled racial slurs and vulgar language, including "fuck that nigger," "I'll kill a fucking nigger," "nigger bitch", etc., at them as well as made aggressive body gestures.

46. Ms. Parks confronted the group of white male students when she noticed her daughter became noticeably nervous and uncomfortable. The Agriculture teacher, Brad Pierce, who witnessed everything refused to intervene.

47. Ms. Parks then called another Agriculture teacher, Tiffany Black, to inform her of the incident and let her know that Mr. Pierce was ignoring the racial slurs and inappropriate behavior by the group of white male students. Ms. Black insisted that Mr. Pierce to remove the group from the property, but he failed to do so and continued to teach "pig church."

48. Ms. Parks reported the incident to Susan Leos, Interim Principal, as well as Trevino, Assistant Principal, but they failed to do anything at all until Ms. Parks persisted with her

requests.

49. After the incident, Ms. Parks was told by FFA alumni members that the kind of behavior her family experienced was normal, that some of the white males in the group were considered dangerous and the teachers were afraid of them. Ms. Parks was also warned that her family needed to be careful.

50. Later that month, Ms. Leos and Mr. Trevino spoke at an FFA alumni meeting where they vaguely discussed inappropriate behaviors of students but failed to address that the incident was racially motivated and any corrective actions that would take place.

51. Ms. Parks decided to speak at the meeting and explain the previous incident in detail.

52. Ms. Parks was then told by Ms. Leos and Mr. Trevino that they would investigate the incident and that the campus police would conduct nightly checks of the farm with a curfew.

53. The family reasonably believes the School District did nothing, as students continued to drink alcohol at the farm, vandalize, steal, and harass Camron.

54. Instead of any corrective action plan being put in place, Ms. Parks was asked by Mr. Trevino, approximately five months after the incident, if she would like to receive an apology letter from the group of white male students which she never received.

55. At the end of the school year, FFA students J.D., C.B., W.G., K.R., K.N., M.K., and K.C., as well as some of their parents, began using racial slurs towards Ms. Parks such as "nigger bitch" and "black bitch."

56. When Ms. Parks reported the incidents to Associate Superintendent Dr. Craig Shapiro, Beverly Reeves, and Susan Leos, she was told they were working on changing the culture

of the campus. Nevertheless, and to her knowledge, no action was taken.

57.     On or about April 29, 2017, Camron attended the Band Banquet for participating in the James Bowie High School Outdoor Performing Ensemble.

58.     To the family's dismay, Camron was presented the "Sass-quash" award and was humiliated in front of hundreds of people.

59.     A simple internet search depicts sasquatch as a big-oversized monkey/gorilla.

60.     That summer Mr. Pierce and Ms. Black quit working at James Bowie High School.

        ii.     2017-2018 SCHOOL YEAR

61.     The 2017-2018 school year started with new Agriculture teachers, Amber Dickerson and Shelby Stephens, as well as a new Principal, Mark Robinson.

62.     Ms. Parks was asked to run for a position on the Alumni Board of the FFA program for the 2017-2018 school year, and was told by Ms. Dickerson and Ms. Stephens that they were aware of the program's racial tensions and would have zero tolerance for it.

63.     That year students continued to make racial jokes and hurl racial slurs in the presence of the Agriculture teachers with no repercussions.

64.     Additionally, the words "nigger"  had been scraped on boards at the farm, written on window in the pig barn prior to them being broken out, and in the girls' restroom near the gym.

65.     Ms. Parks wrote an email to the Agriculture teachers to report the incidents. She then received an emailed from Ms. Leos who stated Ms. Parks needed to forward all communication to her going forward and that she would address any concerns Ms. Parks had from now on.

66. In October of 2017, Camron and Ms. Park found a white feed bag, stuffed to appear like a head, with a noose around the neck hanging above her equipment and pigs.

67. Instead of removing the feed bag hanging from a noose in C.S.'s area, the Teacher allowed the student to write "Boo I'm a ghost" on the bag and was left to continue to torment C.S.

68. After many failed attempts of addressing the racial discrimination Camron and her family consistently faced, Ms. Parks contacted the District office to inquire about who she addresses her concerns to when Ms. Leos stopped communicating with her.

69. Ms. Parks was finally able to speak with Associate Superintendent of High Schools, Dr. Craig Shapiro. He too promised to investigate the incidents and asked Ms. Parks to meet with the new Principal to develop a plan of action, but he never did anything.

70. When Ms. Parks met with the new Principal it was very apparent that he was not briefed on any of the incidents by Ms. Leos. Ms. Parks had to go over every incident and relive the trauma it caused Camron and the family. He never did anything either.

71. Ms. Parks continued to advocate for her daughter and family, which unfortunately fell on deaf ears. In fact, Ms. Parks has two years of communications with Dr. Shapiro, Campus Administrations, teachers, and Dr. Cruz's Assistant and never received a response.

72. Due to the family's correspondence with Administration regarding the racism they repeatedly experienced, Camron began experiencing disparate treatment and even retaliation.

73. For instance when Camron ran for officer in the FFA program, she was given specific instructions/criteria to follow for speeches, the application, and behavior that was required in order to run for the position, but At the last minute the white students were allowed to sing, rap, and use power points for their speeches and Camron was not afforded the

same opportunity.

74. When Camron asked the teacher about the change, she was told Student C kept begging her and stated she already had a routine, so she said okay last minute.

75. Camron was consistently told the horse judging competition team needed to be at school one hour before school for practice, and anyone who failed to do so would be automatically kicked off the team.

76. Nevertheless, when the white students missed horse judging competition practice there were no repercussions, but when Camron missed a practice for a school band competition she was told she needed to attend a Flexible Instructional Time ("FIT") session to make it up.

77. When Camron addressed the teacher about the disparate treatment, she was told the teacher knows the other students are not taking it serious, Camron needed to continue to do what she was supposed to do.

78. Additionally, Camron was required to come to the classroom to study while the white students were told they could "study" at home.

79. More often than not, Camron was the only student present.

80. In the spring of 2018, Camron participated in concert band.

81. On one particular occasion, Camron was in the Band Hall sitting in the pit section getting ready to perform in class.

82. A senior pit section leader walked up to Camron and stated "Oh my God! So, is this like a weave?!"

83. She then asked Camron if her hair was a weave, and immediately stuck her hand in hair to feel it.

16

84. Feeling violated, Camron told the senior pit leader to not touch her, to which the girl stated she was the pit leader and she could touch her hair if she wanted to.

85. These horrendous racial experiences forced Camron to want to quit band.

86. In the summer of 2018, some student officers, including student G, student C, and student K, of the FFA program were seen vaping at a state FFA convention in Fort Worth, Texas.

87. Camron spoke privately to the teacher about the other officers' misconduct. The teacher spoke with the officers, who all came to Camron hotel room and were very confrontational.

88. After the vaping incident, Camron began experiencing more even harassment and bullying. They began to call Camron a snitch and purposely left her out of group communications between the officers.

89. When Ms. Parks brought the issues to the Principal's attention he stated he asked the officers about the incident and they denied the incident, so he had to believe the other officers.

       iii. 2018-2019 SCHOOL YEAR

90. On one occasion, a white student walked up to Camron and stated that he had a nickname for her, not "nigger, but noodle nigger!"

91. Camron told Ms. Parks what happened, and she advised Camron to report the incident to Principal Robinson who handed it over to Assistant Principal McGraw.

92. When Ms. Parks picked up Camron from school, Ms. Parks could tell Camron had been crying and was visibly shaken and angry.

93. Camron informed her of the incident, and Ms. Parks immediately called Mr. Robinson's Assistant to meet with him. That day, Mr. Robinson took Ms. Park's statement of the

17

incident and told her he would address the issue right away.

94.    Ms. McGraw stated she was a former student of Bowie High School and she witnessed first-hand the racism Camron described and continues to see it in the hallways.

95.    Ms. Leos intervened in the meeting and told the family Ms. McGraw could not disclose the disciplinary actions taken against any student for confidentiality reasons.

96.    Less than thirty minutes after the meeting, the family arrived at the farm for "pig church" where they practiced showing the pigs in the arena for competition. They were met by the same white male student with two-three other students who began screaming "hey you racist son-of-a-bitch! I thought we were banned from the farm cause we're fucking racist! We may call someone Nigga!"

97.    The teacher, Ms. Dickinson, heard the racial slurs and harassment. Nevertheless, she failed to address the comments and instead stated she was cold and left to get her jacket out of the car.

98.    As the harassment and racial discrimination continued, Ms. Sneed called Principal Robinson, and demanded he intervene before someone gets hurt since none of the students were being disciplined for their actions. She was told that actions were being taken but changing the culture of the school took time. Further, she was not told what those actions were.

99.    Additionally, Mr. Robinson told Ms. Parks he would support Camron transferring to another campus if Ms. Parks was unhappy with the way things has transpired and were continuing to go.

100.    When Ms. Parks brought up her concerns regarding the racial jokes, slur, and harassment

in a meeting with Stephanie Parker, President of FFA Alumni, Kristin Benton, Treasurer of FFA Alumni, Susan Leos, Assistant Principal, and Mark Robinson, she was only offered the explanation that " it is not just FFA kids, it's all over Bowie."

101. As Camron and her family continued to advocate for themselves and point out the racial disparity, the Agriculture teachers started to become upset and retaliate towards C.S.

102. Unsurprisingly, the thirty-year old Alumni Organization that Ms. Parks had become a board member of was disbanded after she brought the racial disparity to their attention and the organization started to report the problems.

103. Shortly after the Alumni Organization was disbanded, the Principal filed a police report that claimed an old alumni tractor had been stolen by Mr. Sneed that had actually been sold when the organization was disbanded.

104. Additionally, the teachers named Camron in the police report as a possible suspect.

105. The family began receiving phone calls that the Principal and others were spreading rumors throughout the school and community about the stolen tractor and advised Mr. Sneed to come forward and admit the theft.

106. The family immediately contacted Dr. Shapiro to meet and go over the accusations.

107. When the family was finally able to view the footage of Mr. Sneed being present during the sell the tractor, the Principal asked the teachers to identify the "bald black guy" who was with three white people.

108. Craig Shapiro promised the family to hold to meetings to address the slander and defamation of character, but instead he avoided the family for months, and once again did nothing.

109. The week of the Travis County Youth Show ("TCYS"), Ms. Parks received a call from the Principal who informed her that if Camron made auction with her animals the school would not bid on her and support her, because the family did not join the booster club.

110. Ms. Parks then checked with the parents of white students who were also not members, and not one of them received the same call.

111. Student K.R., who carved a penis on C.S.'s equipment and cut her animals, kept showing up to places Camron was at to intimidate her while she showed up to TCYS, and became angry when she was asked to leave.

112. She went to the campus to confront the Principal and was arrested.

113. The family was informed that Student K.R. was arrested for trespassing and calling the Principal racial slurs such as "nigger lover," but not for the warrant she had for the crimes she committed against C.S.

114. Rumors were spread about the family again. Specifically, that the family had Student K.R. arrested.

115. Mark Fischer and Gary Adams pulled Mr. Sneed's old criminal record from over thirty years ago to show families, students, and Travis County Board Members that Camron and her family should not be able to participate in school activities.

116. The same people began gossiping and spreading rumors claiming that C.S.'s father was a criminal and he shouldn't be around children while she was working the auction.

117. Further, they told C.S.'s fellow classmates, FFA member, and people at the TCYS county show that Camron came from a bunch of criminals, causing Camron to break down.

118. Camron texted and called her mother that she could not go on like this.

119.    Camron left the auction stage and collapsed outside in tears. She eventually went to the bathroom and was crying uncontrollably.

120.    When Mr. Sneed arrived, he found C.B. being consoled by a family friend, Stephanie Parker.

121.    Camron was asked by a teacher "can't you just put this in a box to the side until after the auction?"

122.    Ms. Parks had reached out to Dr. Paul Cruz, Superintendent of AISD, since C.S.'s 8th grade year to address her concerns was always told by the secretary he was "very busy"  and she would pass on the emails. She never received a response.

F.    EFFECTS OF THE RACIAL HARASSMENT AND BULLYING ON C.S.

123.    Due to the racial discrimination Camron has experienced as well as the retaliation for the last three years, Camron experienced from sleep apnea, loss of appetite, and inconsolable crying.

124.    Ms. Sparks has asked for mental health assistance from the school due to the failures of the School District, but received no support for that request.

125.    Campus police and Dr. Shapiro have made empty promises on remedying the effects on Camron, and are instead focused on the school's reputation.

G.    THE SCHOOL DISTRICT VIOLATED TITLE VI IN THE FOLLOWING WAYS

126.    Whether it be pursuant to applicable jurisprudence, regulations, executive agency directives, Texas law, professional standards of care and School Board Policies and procedures, the Austin Independent School District violated the rights of C.S., in the following manners and particulars.

127.    The School District Officials failed to provide to provide Camron or her parents notice of

their procedural rights, as set forth by the regulations promulgated under Title VI.

128. They never provided Camron or her parents the information about who the Title VI Coordinator was for the District.

129. They never provided information to Camron or her parents about their right to file a formal grievance with the School District in a timely manner.

130. They never provided Camron or her parents the information about their right to file a formal complaint with the Office of Civil Rights in a timely manner.

131. They failed to provide to provide Camron school-based counseling services.

132. They failed to offer the parents they pay for Camron to receive counseling services.

133. They failed to provide her an aide or shadow to observe her at school.

134. They failed to provide her social skills training.

135. Moreover, the School District failed to implement appropriate safety measures to prevent future bullying and otherwise provide a safe environment for C.S.

136. They failed to address the impact of the harassment on C.S.

137. They failed to complete a confidential survey of bullying and harassment at the school.

138. They failed to use the incident with Camron as a teaching moment with her classmates.

139. They failed to use the incident with Camron as a teaching moment with staff.

140. There were no special auditorium programs on Title VI related issues.

141. There were no specific classroom programs on Title VI related issues.

142. There was no meeting or mediation set up with Camron and any of the other children she had problems with.

143. There was no training to students or staff on issues of unconscious or implicit bias.

144. Based upon all the above, it is clear that the Austin Independent School Board failed in a number of manners and particulars as well, regarding training and supervision of staff.

145. For instance, even though Plaintiff's parents made a number of explicit complaints they believed Camron was a victim of bullying and harassment because she was an African American female, no one ever reported it to the School Superintendent as required.

146. Whatever investigations were done by District personnel, none were completed under the very specific purview and guidelines for a Title VI Investigation.

147. The School Board apparently never provided any staff training on how to conduct a Title VI Investigation.

148. Even though there are a substantial number of African American students there are no specific training programs for staff on the specific cultural issues regarding this race/ethnicity. Nor is there any specific training program to staff on implicit or unconscious bias.

149. Because of the various failures of the School Board and School District personnel to correctly deal with the allegations that Camron was a victim of bullying and harassment, whether by other students or staff or both, because she was an African American female.

## VI. <u>STATE ACTION</u>

150. Plaintiff incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

151.    The District, in any capacities and in all matters, acted under color of state law when it permitted Plaintiff to be subjected to the wrongs and injuries set forth herein.

## VII. UNCONSTITUTIONAL POLICIES, PROCEDURES, PRACTICES & CUSTOMS

152.    During the relevant time period contemplated by this cause of action, the Austin ISD School Board had an actual practice and custom of conscious and deliberate indifference to the federal law, federal rules, directives from federal executive agencies, and their own School Board policies and procedures in regard to the discriminatory treatment of C.S., and such failures were a moving force in the injuries to Camron for which she seeks recovery pursuant to 42 U.S.C. §1983.

153.    First and foremost, the District is liable to Camron for violations of C.S.'s rights pursuant to the Due Process Clause of the 14th Amendment pursuant to a Theory of Supervising Liability.

154.    Specifically, Dr. Craig Shapiro is the Associate Superintendent for all the Austin Independent School District high schools. He was intimately knowledgeable about the complaints that Camron was a victim of race-based animus. Pursuant to Board Policy, practice or custom he had the supervisory capacity to investigate such allegations. He failed to do so and was thereby deliberately indifferent to C.S.

155.    Additionally, he had the Supervisory duty to assure staff working under his purview were sufficiently trained in addressing race-based animus, and he failed to do so, and was deliberately indifferent to Camron thereby.

156.    Specifically, the District had a custom and practice of refusing to fulfill the requisites of Title VI Jurisprudence and investigate allegations of bullying, harassment and assault after receiving complaints that such actions were based upon racial animus.

157.    In addition, and in the alternative, this School Board obviously failed to correctly supervise staff in regard to the laws, regulations and directives as noted above. Such failures, in addition and in the alternative to the above, rise to the level of a separate violation of the Fourteenth Amendment of the Constitution of the United States for which Plaintiff seek recovery pursuant to 42 U.S.C. §1983.

158.    Moreover, and in addition, and also in the alternative to the above, this School Board obviously has failed to train staff in regard to the laws, regulations and directives as noted above. Such failures, in addition and in the alternative to the above, rise to the level of a separate violation of the Fourteenth Amendment of the Constitution of the United States for which Plaintiff seek recovery pursuant to 42 U.S.C. §1983.

159.    Specifically, they obviously failed to train staff on how to address complaints based upon racial discrimination. They failed to train staff on cultural issues regarding African-American persons. They failed to train staff on cultural issues regarding unconscious bias or implicit bias of persons who are of African American descent. The need for such training is obvious when looking at the issues facing the greater City of Austin, the State of Texas and the greater United States of America, regarding these very same concerns. Moreover, such training is required by federal jurisprudence.

## VIII. <u>CLAIMS PURSUANT TO TITLE VI OF THE CIVIL RIGHTS ACTS OF 1964</u>

160. Plaintiff incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

161. Title VI of the Civil Rights Act of 1964 and its implementing regulations require that each state that receives disbursements, including the state's political subdivisions, not permit the student to be a victim of discrimination based upon race or racial stereotypes.

162. Plaintiff assert that because the supervisory staff with Austin ISD knew that Camron was being bullied, harassed and physically assaulted based upon her race and failed to keep her safe from harm, and failed to provide her an environment that was not hostile, such failures as noted above, have together and separately, contributed to violating her civil rights pursuant to Title VI.

163. Pursuant to relevant jurisprudence on the topic, including School Board Policies and Procedures, District personnel had a duty to investigate such concerns and refused to do so and acted with deliberate indifference, thereby violating her civil rights pursuant to Title VI thereby.

164. In addition, Plaintiff assert that because the School District Defendant refused to remedy the effects of the bullying and harassment Camron experienced, whatever the cause, also violating her civil rights pursuant to Title VI thereby.

## XI.   <u>RATIFICATION AND RESPONDENT SUPERIOR</u>

165. Plaintiff incorporate by reference all the above-related paragraphs with the same force and

effect as if herein set forth.

166.    Austin ISD ratified the acts, omissions and customs of school district personnel and staff.

167.    As a result, Austin ISD is vicariously responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of Camron pursuant to the Theory of Respondent Superior.

## X.   PROXIMATE CAUSE

168.    Plaintiff incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

169.    Each and every, all and singular of the foregoing acts and omissions, on the part of the School District, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XI.   DAMAGES

170.    Plaintiff incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

171.    As a direct and proximate result of the School District's deliberate indifference, Camron has suffered injuries and damages, for which she is entitled to recover herein including but not limited to:

    a.    Loss of equal opportunities to educational services as compared to her Caucasian peers;

    b.    Physical pain in the past;

27

c.   Medical expenses in the past;

d.   Mental anguish in the past;

e.   Mental anguish in the future;

f.   Physical impairment in the past,

g.   Reimbursement of past and future taxes collected by the Austin Independent School District that Camron cannot benefit from; and

h.   Various out-of-pocket expenses incurred by her family but for the acts and omissions of the School District.

## XII. <u>ATTORNEY FEES</u>

172.   Plaintiff incorporate by reference all the above related paragraphs, as if fully set forth herein.

173.   It was necessary for Plaintiff to retain the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiff are entitled to an award of attorney fees and costs pursuant to 42 U.S.C. §2000d et seq. and 42 U.S.C. §1988.

## XIII. <u>SPOLIATION</u>

174.   Plaintiff hereby require and demand that Austin ISD preserve and maintain all evidence pertaining to any claim or defense related to the assault or other violations that make the basis of the complaint and the damages resulting therefrom, including statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic

data/information, and any other evidence regarding the violations set forth herein.

175.     Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use of the spoliation inference rule- an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case.

## XIV. <u>DEMAND FOR JURY TRIAL</u>

176.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demand a jury trial for all issues in this matter.

## <u>PRAYER</u>

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff pray for judgment against the District in the manner and particulars noted herein and above, and in an amount sufficient to fully compensate them for the elements of damages noted herein and above, judgment for damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action and for its appeal if required, together with pre- and post- judgment interest and court costs expended herein, as well as the equitable issues noted herein and above; and for such other relief as the Court, in equity, deems just and proper.

Respectfully submitted,
/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
SBN 00783829
FID 21488
Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]

marty@cirkielaw.com [Email]

Mr. Anthony O'Hanlon, Esq.
Anthony O'Hanlon, P.C.
SBN 15235520
111 South Travis Street
Sherman, Texas 75090
(903) 892-9133 [Telephone]
(903) 957-4302 [Facsimile]

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing has been forwarded to all parties on this 13th day of April, 2020, in accordance with the Federal Rules of Civil Procedure and the Court's electronic filing system.

ROGERS, MORRIS & GROVER, L.L.P.
Jonathan Brush
jbrush@rmgllp.com
Amy Demmler
ademmler@rmgllp.com
5718 Westheimer, Suite 1200
Houston, Texas 77057
Telephone: 713-960-6000
ATTORNEYS FOR DEFENDANT
AUSTIN INDEPENDENT SCHOOL DISTRICT

*/s/ Martin J. Cirkiel*
Martin Cirkiel, Attorney

*First Amended Complaint*

1