## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **CAMRON SNEED,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 1:19-cv-608** |
| | § | **Jury Trial** |
| **AUSTIN INDEPENDENT SCHOOL** | § | |
| **DISTRICT,** | § | |
| *Defendant.* | § | |

### AUSTIN INDEPENDENT SCHOOL DISTRICT'S
### MOTION FOR SUMMARY JUDGMENT

### Introduction & Summary of the Argument

Camron Sneed, a graduate of Austin Independent School District (AISD or the District), alleges the District violated Section 1983 and Title VI. Although Sneed's complaint asserts she was a victim of numerous incidents of racial harassment as a student, that the District failed to address, the evidence simply does not support Sneed's allegations. After a review of the evidence, this Court will find that Sneed's allegations of racial harassment are unfounded and the District was not deliberately indifferent to her rights. As such, the District is entitled to summary judgment on both Sneed's Section 1983 and Title VI claims.

### Factual Background

***Camron Sneed.*** Sneed is an African American female, who graduated from James Bowie High School (Bowie). Sneed Depo., Exh. 1, at 8:5-9:20, 13:3-8; Sneed, Sr. Depo., Exh. 2, at 11:15-20. Her mother is Pamela Parks and her father is Charles Sneed. Exh. 2 at 11:15-20; Parks Depo., Exh. 3, at 9:24-10:25. Sneed participated in multiple extra-curricular activities during her time at Bowie, including Future Farmers of America (FFA), Band, Track, Volleyball, and the Multi-Cultural Awareness Club (MCAC). Exh. 1 at 24:3-12, 26:11-27:15, 29:16-30:10. Further, she held

1

officer positions in MCAC and both the school and district-wide FFA chapters. *Id*. at 16:19-17:7, 24:15-25:7. Even with a busy schedule of extra-curriculars, Sneed consistently maintained good grades and will attend LSU in Fall 2020. Exh. 1 at 13:13-14:24; Exh. 2 at 12:13-13:10; Exh. 3 at 34:10-18. She plans to study agricultural science and pursue a career as an equine veterinarian. Exh. 1 at 13:13-14:24.

**AISD and James Bowie High School.** Administrators at Bowie strive to uphold and instill values of inclusivity at the school. Robinson Decl., Exh. 7, at 4; Policy FFH, Exh. 8. Cultural proficiency is identified as a core value and is incorporated into documents and presentations given during professional development meetings with staff at Bowie. Exh. 7 at 4. On a student level, Bowie's MCAC chapter is made up of a diverse group of 25-30 students, from different ethnicities and races, that organize multicultural events and programs the entire student body attends. Exh. 1 at 24:15-26:10. Teachers and administrators support multiple student cultural events throughout the year, including, but not limited to, Black History Month celebrations, Hispanic Heritage month celebrations, African American Heritage Awards celebrations, and Spanish Honor Society induction ceremonies. *See generally* Exhibit 9. Further, Bowie is a No Place for Hate school. Exh. 7 at 4.

Every year, AISD trains the administrators of each school. Robinson Depo., Exh. 4, at 15:3-19, 17:7-18:21, 25:5-8; Leos Depo., Exh. 5, at 13:6-24, 14:17-15:14; Shapiro Depo., Exh. 6, at 13:8-15:17. This training includes student safety and student management, which teaches how to properly conduct Title VI, ADA/Section 504, and Title IX investigations for bullying or harassment based on a student's race, gender, or disability. Exh. 4 at 17:7-18:21. Campus administrators then train their staff. *Id*. at 15:11-19.

Within the education system, there are multiple levels of student discipline available to

administrators. Exh. 7, at 7. The decision regarding which discipline to administer, and for how long, depends on the severity of the offense and the past behavior of the student. *Id*. Consistent with the Texas Education Code, available discipline includes having a conference with the student or the student's parent and reprimanding the behavior; assigning the student to detention, in school suspension, or out of school suspension; and expulsion. *Id*.; Tex. Educ. Code §§ 37.001, *et seq*. Student discipline is confidential and cannot be shared with other individuals who are not that student's parent or legal guardian. *Id*.

*2016-2017 School Year.* As a Freshman, Sneed participated in Band, FFA, Volleyball, and Track. Exh. 1 at 26:22-23. Sneed admits she did not face discrimination based on her race from any of the teachers, coaches, and administrators involved in these programs. *Id*. at 32:10-13, 37:5-38:7, 51:23-52:7, 54:16-20, 79:16-21, 88:24-89:14. During this school year, Susan Leos was interim principal. Leos Decl., Exh. 10, at 2; Exh. 5 at 11:20-22.

As early as August 29, 2016, Parks emailed Dr. Craig Shapiro, Associate Superintendent of High Schools for the entire District. Shapiro had been principal of the high school Parks' older daughter attended and, as such, Parks knew Shapiro. "Bowie High School," Exh. 11. When she first contacted Shapiro, Parks was concerned about teacher turnover at Bowie and an issue with Sneed's schedule that Parks believed had not been addressed timely. *Id*; Exh. 10 at 3; Exh. 5 at 12:7-11. Shapiro responded that same day, informing Parks that, if she had an issue with campus level administration, he was her contact. Exh. 11. Shapiro continued to communicate with Parks throughout Sneed's time at Bowie, and helped facilitate communication between Parks and the Bowie administration. *See generally* Exhibit 12.

Band. Sneed participated in the percussion section of Band. Exh. 1 at 27:4-6. The Band's Director was Ryan Thomas, and the Percussion Director – a teacher – was Reid Paxton. *Id*. at 37:2-

11, 39:13-25. The AP assigned to supervise the Band program was Lawrence Britton. Exh. 5 at 19:1-3.

Sneed claims she heard other students in Band use the n-word on a regular basis, although never directed at her. Exh. 1 at 38:16-39:5, 41:12-15. Sneed never reported students' use of the n-word to Thomas, but rather would only report the language to Paxton. *Id*. at 43:18-44:14. However, she would not report the inappropriate language every time she heard it. *Id*. Further, Sneed testified that every time she did report inappropriate language to Paxton, he would respond by addressing the students immediately. *Id*. at 39:11-40:13. Sneed admitted the students would stop using the language for about a week, but then resume when not in the presence of a teacher. *Id*. at 44:1-7.

In November 2016, Sneed attended the Band's trip to Indianapolis. *Id*. at 45:1-51:22. During competitions, all Band members were required to have homogenous hairstyles. *Id*. As such, Sneed and two other students – an African American and Hispanic friend – were helping each other with their hairstyles for the competition. *Id*. Another student, D., who was in the Color Guard, walked up to the three girls and stated that their hair needed to be redone because it "looked like shit." *Id*. Sneed's Hispanic friend walked away, and D. continued to say to Sneed and the other African American student that their hair "looks like shit." *Id*. Sneed was upset by D.'s statements and called Parks. *Id*. Parks called Bowie's main office and spoke with the administrative assistant, who relayed Parks' message to Leos. Exh. 3 at 34:19-37:20, 40:20-44:2; Exh. 5 at 18:21-19:5. Leos called Britton, who was chaperoning the Indianapolis trip. Exh. 5 at 18:21-19:5. Britton, who is African American, called Parks and stated he would investigate the matter and speak with Sneed, which he did. Exh. 3 at 34:19-37:20, 40:20-44:2; Exh. 5 at 18:21-19:5. Afterwards, D. apologized to Sneed on two occasions – once while still in Indianapolis, and once upon the Band's return to Austin. Exh. 1 at 45:1-51:22. Further, AP Stephanie McGraw spoke with Sneed about the incident

and had Sneed write a statement for the administrative file. *Id*. at 54:21-56:17.

The end-of-the-year Band Banquet was held on April 29, 2017. *Id*. at 58:12-62:21, 69:8-21. At the Banquet, students were celebrated for their achievements and performances throughout the year. *Id*. Additionally, student section leaders were allowed to nominate and present awards to other Band members within their section. *Id*. Sneed received the "Sass-quatch" award because she was "so sassy." *Id*.; Sass-quatch Award, Exh. 13. However, Sneed, Parks, and Sneed, Sr. were offended by the award. Exh. 1 at 58:12-62:21; Exh. 2 at 90:8-91:15; Exh. 3 at 122:23-131:12. Sneed believes Thomas spoke to the section leaders regarding the award. Exh. 1 at 58:12-62:21. Yet, Parks stated she did not report the incident to an administrator until the following school year. Exh. 3 at 131:2-12.

FFA. During the 2016-2017 school year, the Agricultural Science (Ag) and FFA programs were advised by two teachers – Brad Pierce and Tiffany Black – and overseen by AP Vicente Trevino. Exh. 1 at 75:13-76:3; Exh. 10 at 4. The Ag and FFA programs at Bowie utilize a piece of property located near Bowie's campus, called the Farm. Exh. 7 at 5; Kirkov Decl., Exh. 14, at 3-4. The Farm has paddocks, barns, pig and hen pens, and other structures that help Ag and FFA students learn and raise animals. Exh. 14 at 3-4. During the 2016-2017 school year, the Farm was owned by a private individual who lived on the Farm and who granted access and use of the property to Bowie's Ag and FFA programs. Exh. 7 at 5; Exh. 14 at 3-4. Because the District did not own the property, the District could not exercise complete management over the property – like instilling a curfew, repairing broken windows and boards, and removing graffiti. Exh. 7 at 5; Exh. 14 at 3-4.

Early in September 2016, Parks expressed concerns to Trevino that she witnessed students drinking and smoking at the Farm, as well as being at the Farm after hours and without adult

supervision. Exh. 10 at 4; "Re: Bowie HS," Exh. 15. Trevino met with Parks, in person, to hear her concerns. Exh. 10 at 4; Exh. 15. Trevino further talked to the students identified by Parks as those who were seen drinking and smoking at the Farm, and reported his findings to Leos. Exh. 10 at 4; Exh. 15.

In November 2016, Parks reported to Trevino that someone (presumably a student) set a fire at the Farm. Exh. 10 at 5. District police officers investigated, but were unable to determine what had occurred as the students were generally uncooperative and there was no surveillance footage of the area. *Id.*

On or about December 14, 2016, Parks accompanied Sneed to the Farm after school so that Sneed could participate in Pierce's "Pig Church." Exh. 12 at Sneed10-12; Exh. 5 at 19:8-20:7, 21:4-13, 22:8-16; Exh. 3 at 19:15-20:14, 21:19-29:19, 31:9-25; Exh. 1 at 83:22-88:23. Pig Church was an exercise conducted by Pierce with all Ag and FFA students who were raising pigs in the program. Exh. 3 at 19:22-20:3; Exh. 1 at 84:13-21. It was essentially a mock auction show, held in an arena at the Farm, to help students learn how best to show their pigs. *Id.* When Parks and Sneed arrived at the Farm, Sneed retrieved her pig from its pen and went directly to the arena where the other students and Pierce were located. Exh. 3 at 19:15-20:14, 21:19-29:19, 31:9-25; Exh. 1 at 83:22-88:23. Meanwhile, Parks answered a phone call in her truck. Exh. 3 at 19:15-20:14, 21:19-29:19, 31:9-25. After exiting her truck and walking towards the arena, Parks noticed a group of male students standing outside of the arena. *Id.* Parks claims the students were using the n-word and other vulgar language. *Id.* Parks looked at Sneed, who was inside the arena at the time, to ensure she was okay, and noticed that Sneed seemed unbothered and was engrossed in Pig Church. *Id.* Parks attempted to call out to Pierce, but Pierce did not hear her, as he was focused on teaching the students. *Id.* Parks then addressed the students directly and told them their language

was inappropriate. *Id*. The students called her a "bitch." *Id*. Parks then pulled Sneed from the ring and told her to put her things away and get in the truck. *Id*.

Parks called and reported this incident to Black, as the male students appeared to be speaking vulgarly about her. *Id*. Apparently, Black had reprimanded the students earlier that day. Exh. 1 at 87:22-25. Parks also met with Trevino on December 15, 2016, and discussed the vulgar language used by the students. Exh. 12 at Sneed10-12. Parks further emailed Leos to set up a meeting. Exh. 10 at 6. In her email, Parks addressed the incident, but also her concerns about the apparent lack of communication with other administrators, as well as general complaints about student misconduct at the Farm. *Id*.; Exh. 12 at Sneed10-12. After this meeting, Leos contacted Pierce, who stated he had not heard the n-word used by the students. *Id*. Additionally, Leos reached out to the Volleyball and Band teachers regarding Parks' comments regarding lack of communication. *Id*. Further, at Parks request, Shapiro spoke with Parks via telephone on December 16, 2016, following her meeting with Leos. Exh. 12 at Sneed10-12.

On December 19, 2016, Bowie administrators Leos and Trevino held a meeting with the FFA Alumni Board, which consisted of parents of students and community members who supported the Ag program, to address student misbehavior and disrespect while at the Farm, including vandalism, inappropriate language, and theft. "Notes from Special Meeting with Trevino and Leos," Exh. 16. Sneed was not present at the meeting, but Parks was. Exh. 1 at 89:20-90:3; Exh. 3 at 51:22-59:21. Leos and Trevino explained that, often, witnesses would not report misbehavior, denying the school the ability to rectify the situation. Exh. 16. A curfew of 7:00PM was instated and campus police were instructed to patrol the Farm more frequently. *Id*. Further, Leos and Trevino reviewed the school's disciplinary procedures and encouraged parents to report misbehavior. *Id*.

***The 2017-2018 School Year.*** As a Sophomore, Sneed participated in Band, FFA, MCAC, and Track. Exh. 1 at 26:15-16. Mark Robinson was hired as principal and Leos returned to her previous position as the Academic Dean of Instruction at Bowie. Exh. 7 at 2; Exh. 10 at 2. Further, after Black and Pierce left Bowie at the end of the 2016-2017 school year, Amber Dickinson and Shelby Stephens (formerly Fisher) became the two new Ag teachers and FFA advisors. Dickinson Decl., Exh. 17; Stephens Decl., Exh. 18. Sneed testified that she was treated fairly by Stephens and Dickinson. Exh. 1 at 23:6-13, 36:6-13. Further, Robinson spoke to, and met with, Parks and Sneed, Sr. on multiple occasions during his time as Sneed's principal to address any and all of their complaints. *See generally* Exhibit 43; "Bowie FFA Banquet," Exh. 30.

During the summer of 2017, Shapiro contacted Robinson and asked Robinson to meet with a group of concerned parents to discuss the current issues on campus. Exh. 7 at 3. Only Parks attended the meeting. *Id*. During this meeting, Parks generally mentioned the alleged use of racial slurs by FFA students, but her main focus appeared to be a communication issue between Band teachers and parents regarding the prior year's trunk-or-treat event. *Id*. Robinson established the Principal Panel, an advisory board consisting of Bowie students that would meet and discuss ongoing issues at the campus from the students' perspective. *Id*. at 4.

<u>Band</u>. At the Band's Spring concert, Sneed was approached by the Percussion section leader. Exh. 1 at . 62:23-64:17. The student leader touched Sneed's hair and exclaimed "Oh, this is what weave is like." *Id*. Sneed told the student leader to not touch her hair, but the student leader laughed off Sneed's request. *Id*. Sneed went on stage and performed at the concert, but, afterwards, reported this incident to Parks, and not a teacher or administrator. *Id*. According to Sneed, Parks then contacted Paxton. *Id*. At the end of the year, Sneed decided to not continue in Band because she was not given a position on the Band's drum line. Exh. 1 at 52:8-54:15.

FFA. Sneed and Parks state that they saw the n-word written on walls of restrooms at Bowie and on a board and window at a barn on the Farm. Exh. 1 at 71:20-75:12; Exh. 3 at 85:1-90:1, 94:8-14. However, this vandalism was not reported to anyone, and Sneed and Parks could not identify the culprits and conceded that the District could not either. Exh. 1 at 71:20-75:12; Exh. 3 at 85:1-90:1, 94:8-14. Further, any inappropriate graffiti on the barn's boards and window was demolished when a vehicle ran through the wall, destroying the window and board. Exh. 3 at 85:5-87:4. During Summer 2017, the District purchased the Farm as a means to control the management of the property, including conducting necessary repairs and cleaning graffiti. Exh. 7 at 5. Stephens and Dickinson never saw racial slurs painted or scraped at the Farm, only expletives or phallic representations, which were immediately covered with paint. Exh. 17 at 9; Exh. 18 at 12.

On October 16, 2017, Parks emailed Leos that she found empty beer cans in a trashcan located on the Farm property. "Bowie Farm Concerns," Exh. 19; AISD PD Report 17-003251, Exh. 20. After replying to Parks, thanking her for her report, Leos forwarded the information to Robinson, AP Carla De La Rosa, and Officer Stephanie Kirkov – a police officer with the District. Exh. 19; "Follow Up to Initial Farm Concerns," Exh. 42. Officer Kirkov conducted an investigation, which included meeting with, and speaking to, Parks at the Farm. Exh. 20. However, due to lack of evidence or suspects, the case and investigation could not proceed further. *Id.*

Also during October 2017, unknown students hung a ghost, made out of a feedbag, as a Halloween decoration. Exh. 7 at 8; Exh. 18 at 5. The ghost was hung in the main entry room of the Farm's barn, in a separate room from where Sneed's equipment was stored. Exh. 7 at 8; Exh. 18 at 5. Although Sneed and Parks saw the decoration and took offense to it, they did not report it immediately or take any steps to remove it. Exh. 1 at 110:20-114:15; Exh. 3 at 98:10-112:18. Rather, Parks waited until a few days later, during a pre-scheduled meeting between herself,

Robinson, Leos, Stephens, and Dickinson, to tell Bowie staff that she found the decoration offensive. Exh. 3 at 109:20-110:2; Exh. 18 at 8. After hearing Parks was offended by the decoration, Stephens immediately went to the barn and instructed the students to take the decoration down. Exh. 18 at 8. An investigation was conducted by Stephens, Dickinson, Leos, and police officers, but the responsible student was not identified. Exh. 7 at 8.

During the 2017-2018 school year, Sneed participated on the horse judging competition team with two other female FFA students. Exh. 18 at 6. At the beginning of the year, all of the students seemed excited to compete. *Id*. However, following a chaperoned field trip to witness a horse judging competition, in which Stephens acted more authoritatively, the other two students' commitment waivered. *Id*.; "Horse Judging Trip," Exh. 21. The two other students started missing practice. Exh. 18 at 6; Exh. 1 at 132:8-145:22. Even though Stephens told these students they would need to make-up the missed practices by attending Flexible Instructional Time (FIT) sessions, as is protocol in the FFA program, the students only attended periodically. *Id*. As no other student approached Stephens and expressed interest in competing on the horse judging team, Stephens was faced with a decision: drop the two other students from the team – affecting Sneed's ability to compete entirely, as three competitors are required – or allow the two students to stay on the team, thereby ensuring Sneed's ability to compete. *Id*. In the end, Stephens thought it would be unfair to Sneed if she was not allowed to compete due to the indolence of the other students, as Stephens recognized the effort and diligence Sneed was putting into the team. *Id*.

On December 7, 2017, Sneed was in Dickinson's FIT class. Exh. 1 at 118:21-122:1. The bell was about to ring, so all students were congregating at the door of the classroom. *Id*. At this time, another student, W.G., stated to Sneed "Hey Cameron, I have a new nickname for K.: noodle [n-word]." *Id*. K. is an Asian-American student who attended Bowie. *Id*. Sneed did not report this

to Dickinson or any administrator. *Id*. Rather, she told Parks on the car ride home. *Id*. Parks called Robinson's office and reported the incident. Exh. 3 at 137:20-150:12. In response, Robinson spoke with Dickinson – who verified that she did not hear the exchange – and assigned McGraw to investigate. Exh. 7 at 10; Exh. 4 at 60:10-61:24, 78:25-79:3, 99:20-100:18. McGraw interviewed Sneed and W.G., who admitted that he did use the slur. W.G. Discipline Report, Exh. 22; Exh. 1 at 162:23-163:10. McGraw then held a conference with W.G. and his parents, Stephens, and Dickinson, where W.G. was informed that further use of this type of language would not be tolerated and, if continued, would result in suspension and removal from the FFA program. Exh. 22; Exh. 7 at 10; Exh. 17 at 5. W.G. was issued a temporary ban from the Farm and was also informed that if he retaliated in any manner, he would receive additional disciplinary consequences. Exh. 22; Exh. 7 at 10; Exh. 17 at 5; Exh. 1 at 165:14-166:1. Robinson followed-up with Parks, on December 12, 2017, and informed Parks that counseling staff was available to support Sneed. Exh. 7 at 10; "Incident Regarding Racial Slurs," Exh. 23.

Later that same day, Sneed went to the Farm to feed her animals. Exh. 1 at 164:3-167:21. Although administration had just instructed W.G. that he was not allowed on Farm property, W.G. was there. Another male student saw W.G. and shouted, at W.G., "Hey, you racist son of a bitch, I thought you were banned from the Farm, because we are all fucking racists, we may call someone [the n-word]." *Id*.; Exh. 3 at 156:13-157:21. Dickinson was not present during this exchange and, therefore, did not hear it. Exh. 1 at 166:19-23; Exh. 7 at 11; Exh. 17 at 6. Sneed reported this exchange to Parks later that day, but did not report it to a teacher or administrator. Exh. 1 at 166:10-167:10. And Parks did not report this incident until December 13, 2017, during a meeting held between Parks, Dickinson, Stephens, and Robinson. Exh. 7 at 11; Exh. 17 at 6. After Parks' complaint, Robinson verified that Dickinson had not heard the exchange and Dickinson and

Stephens reviewed the Farm rules and expectations with all FFA students, specifically regarding appropriate behavior and etiquette. Exh. 7 at 11; Exh. 17 at 6; Barn Rules and Contract, Exh. 24.

Around early April 2018, after numerous meetings and warnings, the District dissolved the FFA Alumni Board and created an FFA Booster Club. Exh. 7 at 6; Shapiro Letter, Exh. 25; Alumni Board Powerpoint, Exh. 26; Meeting Notes, Exh. 31. This was done because the Alumni Board operated as a separate entity, rather than working with the school, causing tension within the program. Exh. 7 at 6. A Booster Club would align FFA with the other Bowie extra-curricular programs, and would be made-up of parents whose children participated in the program, as opposed to any community member interested in FFA. *Id*. The decision to dissolve the Alumni Board was not received well by its members, including Parks. *Id*.

Following the announcement, Parks reached out to Traci Hendrix, the CTE Curriculum Coordinator for the District, to discuss her concerns regarding the decision to dissolve the Alumni Board and the future of the FFA program. *See generally* Exhibit 27. Following an exchange of numerous emails, on or about April 5, 2018, Hendrix met with Parks and developed a plan to form a "United We Succeed" team for the Bowie FFA program. *Id*. Still unhappy with the dissolution of the FFA Alumni Board, Parks emailed AISD's Superintendent, Dr. Paul Cruz, requesting a meeting. *See generally* Exhibit 28. As Dr. Cruz is responsible for the management of 130 campuses and over 80,000 students within the District, he arranged for his Chief of Staff – the second in command within the District – Dr. Jacob Reach, to meet with Parks. Meeting Invite, Exh. 29; www.austinisd.org/about-us. On April 25, 2018, Dr. Reach met with Parks and Sneed, Sr. at District headquarters in the Superintendent's conference room. *Id*.

During the 2017-2018 school year, Dickinson allowed students to use her classroom to study before and after school, as well as during the lunch break. Exh. 17 at 4. Dickinson's office

is located in a separate room that is connected to her classroom. *Id*. As students often were loud, Dickinson would frequently close her office door to work or eat her lunch. *Id.* On May 21, 2018, Parks reported to Robinson that Sneed told her other students were using the n-word in Dickinson's classroom during the lunch period. Robinson assigned the investigation to De La Rosa. Exh. 7 at 12; "Summary of Incident," Exh. 32; "Phone Conversation Follow Up," Exh. 33. On May 22, 2018, De La Rosa met with Sneed to address the complaint and take Sneed's statement. *Id*. De La Rosa then met with five other students who Sneed stated were present during the time of the inappropriate language. *Id*. Three of the students stated that the room was loud, students were playing games and using curse words, but they never heard the n-word. *Id*. Two students stated that the room was loud, but they had their headphones in at the time and did not pay attention to the other students. *Id*. De La Rosa also spoke with Dickinson, who verified that she had her door closed at the time and was unaware that the n-word, or other expletives, were being used by the students. *Id*. After this incident, Dickinson no longer allowed students to use her classroom to study before school, during lunch, or after school, and reported to De La Rosa that she would ensure her classroom was only being used for tutorials when she was available to actively monitor the students. Exh. 17 at 7. Further, Stephens and Dickinson created and implemented a policy in the FFA handbook that more clearly outlined expectations of the FFA students regarding appropriate language. *Id*.

In Spring 2018, Sneed ran for an officer position in the FFA program for the 2018-2019 school year. Exh. 18 at 7. In order to run for a position, candidates were required to submit an application, write an essay, and give a speech. *Id*. As part of Bowie's and the State district's criteria, speeches could not include props or music. *Id*. Yet, two students, C. and M., prepared their speeches as a rap and a funny PowerPoint presentation. Exh. 1 at 124:3-132:7. After incessant

begging by C. and M., Dickinson allowed the two students to perform their speeches outside of the structured guidelines. *Id.* All of the other officer candidates, including Sneed, found this to be unfair, as all of the other officer candidates had been told they were not allowed to use props or music in their speeches. *Id.* Regardless, Sneed was elected as an officer for the 2018-2019 school year. *Id.* However, C. and M. became President and Vice President of FFA, which Sneed took exception to. *Id.*

During July 2018, the FFA officers traveled to an FFA convention in Fort Worth, chaperoned by Dickinson and Stephens. Exh. 18 at 8; Exh. 1 at 145:23-156:14. Upon arriving in Fort Worth, another officer approached Sneed and informed Sneed that she saw the FFA President, C., with a vape pen. Exh. 1 at 145:23-156:14. This officer, who is white, also informed Sneed that she did not want to report the behavior, because she was called a "snitch" for reporting misbehavior in the previous year. *Id.* Sneed decided to report the behavior to Dickinson. *Id.* Dickinson and Stephens contacted Leos from Fort Worth and, at Leos' instruction, conducted an investigation. Exh. 18 at 8; "Notes from Convention," Exh. 34. Dickinson and Stephens spoke to each student involved, but a vape pen was not located and the other officers denied its existence. *Id.* Regardless, parents were called and informed of the situation. *Id.*; Exh. 7 at 13. This incident created additional tension among the officers, as some officers (including Sneed) did not respect the President because they did not believe she earned her position during the election process. *Id.* Upon returning to Austin, campus administration conducted its own investigation, but, again, were unable to determine if C. possessed the vape pen. *Id.* Without evidence or an admission, no discipline could be imposed.

Following the convention, Sneed reported to Dickinson that she was being excluded by the other FFA officers. Exh. 1 at 159:2-162:12; Exh. 18 at 9. Specifically, Sneed felt that information

was being withheld by other officers and she was being called a snitch – just as the other (white) student had before. *Id*. Dickinson reported this complaint to Leos, who instructed her to perform an investigation. Exh. 18 at 9. Dickinson and Stephens then met with each officer, individually, and explained that their behavior was inappropriate and harmful to the FFA organization. *Id*. They also offered praise to those officers (including Sneed) who were having a positive effect on the FFA organization. *Id*. The Ag teachers instituted a new rule that an officer who continued to exclude another officer would be placed on probation. *Id*. After Dickinson and Stephens met with all officers and instituted the probation rule, Sneed did not report further issues. *Id*.; Exh. 1 at 162:10-12.

On July 13, 2018, during Summer break, Parks emailed Robinson requesting a telephone conference. Exh. 7 at 13. Robinson called Parks and discussed the Fort Worth incident and addressed expectations for student behavior for the coming year. *Id*. During the conversation, the actions of Dickinson and Stephens were commended by Charles, Sr. Robinson followed-up with Leos on the issue, who verified that an investigation into the vape pen incident had occurred. *Id.*

*The 2018-2019 School Year.* During her Junior year at Bowie, Sneed participated in FFA, MCAC, and Track. Sneed also held an officer position in FFA and the position of Junior Superintendent for the Travis County Youth Show (TCYS), an annual FFA auction that is sponsored and hosted by Travis County. Exh. 1 at 194:7-8; Exh. 18 at 11.

The District established a curfew and only allowed individuals directly related to animal projects (i.e. teachers, administration, students, and their parents) on the Farm, unless given permission. Exh. 24. Kylee Rhorer was a former student of Bowie, who graduated in May of 2018. Exh. 7 at 14; AISD PD Report 18-002103, Exh. 35; Exh. 1 at 182:18-22. Rhorer would be seen at the Farm (after hours and with her dog) and would be rude and disrespectful to the teachers and

15

Sneed, Sr. *Id*. Stephens and Dickinson issued Rhorer verbal warnings regarding her behavior, which she ignored. *Id*. After it was suspected (but never proven), that Rhorer vandalized Sneed's equipment by carving a phallic symbol into her feed scoop, a criminal trespass warning (CTW) was served on Rhorer, on September 13, 2018. *Id*.; Exh. 14 at 9; Exh. 35; *Compare* Exh. 1 at 95:12-22 *with* 183:4-14; "Follow up – inappropriate behavior & picture & CTW," attached as Exhibit 36. Rhorer emailed Robinson requesting retraction of the CTW, and Robinson declined. "Urgent," Exh. 37; Exh. 7 at 14; Exh. 35 at AISD230. Rhorer then posted Robinson's email response to her Instagram (a social media website) with the caption: "Fuck your [n-word] loving ass." Exh. 35 at AISD230.

On September 17, 2018, another student informed Robinson that Rhorer had posted pictures on her Instagram of her holding a piglet. Exh. 7 at 15. From the pictures, it appeared Rhorer was on Farm property, after hours, and in violation of the CTW issued to her days prior. *Id*. Robinson notified Officer Kirkov, who conducted an investigation. Exh. 35. Officer Kirkov was able to identify the pig pen in Rhorer's photos as Sneed's pen. Exh. 14 at 9. Officer Kirkov then met with Sneed and Parks at the Farm and took photos of the pig. *Id*.; Exh. 35. The pig appeared to have superficial scratches, but no serious injuries. *Id*. Following the criminal investigation, Officer Kirkov issued an arrest warrant for Rhorer for criminal trespass. *Id*. Robinson followed-up with Officer Kirkov on two separate occasions to ensure the warrant had been issued. Exh. 7 at 15. Sneed is not the only student whose animals were handled without permission. "Info so far on farm incident last night at 11pm," Exhibit 38. School police have been involved when reports of other students are on Farm property, after curfew, and decide to handle other students' animals, without permission. *Id*.; Exh. 14 *generally*; "Ag Farm," Exhibit 39.

During the 2018-2019 school year, the FFA Alumni Board was still in the process of

inventorying all equipment after its dissolution on July 31, 2018. Exh. 7 at 16. Per its own Bylaws, all equipment and real property became the property of the District upon dissolution of the Alumni Board, and the Alumni Board President was tasked with overseeing the transfer of property. *Id*.; FFA Alumni Board Constitution & Bylaws, Exh. 40.

On or about September 18, 2018, Robinson became aware that a tractor that was previously maintained by the Alumni Board, but that now belonged to the District, was removed from the Farm, without the District's knowledge. Exh. 7 at 16. Robinson informed Officer Steve Melton, another school resource officer with the District, who conducted an investigation, which included reviewing video footage of the tractor being removed from the property. *Id*.; AISD PD Report 18-002121, Exh. 41. On the video, an African American male is seen driving the tractor and loading the tractor on a trailer that was then driven off the Farm. Exh. 41. In order to identify this man, Officer Melton interviewed Stephens and Dickinson, who told Officer Melton that the man driving the tractor in the video looked like Sneed, Sr. *Id*.; Exh. 18 at 10. As Robinson was aware of the sensitive situation surrounding the tractor (i.e. that the Alumni Board members were not happy with its dissolution and the transferring of property to the District), he explained to Officer Melton that he wanted to wait for approval from the District's legal department prior to taking any criminal action. Exh. 7 at 16; Exh. 41. Robinson did not view the surveillance footage either, as he wished to remain impartial to the process and leave the criminal investigation to law enforcement. Exh. 7 at 16. No further action was taken by the District – no arrest warrants were issued, no arrests made, and no criminal charges brought. Exh. 7 at 16; Exh. 41; Exh. 1 at 180:13-16; Exh. 2 at 72:4-24; Exh. 3 at 159:15-161:12; "FW: FFA Investigation," Exh. 44. Further, Sneed herself never saw the police report and knew nothing about the allegations surrounding the tractor. Exh. 1 at 178:16-179:25.

Rumors in the local FFA community began spreading regarding the tractor. Exh. 7 at 17. Two non-District employees who were involved in the FFA community, Mark Fisher and Gary Adams, approached Robinson and requested to meet regarding the tractor. *Id*. On September 18, 2018, Robinson met with Fisher and Adams, but did not show them the video or share the police report. *Id*. A month later, around October 12, 2018, Fisher came to see Robinson in his office, without an appointment, and gave Robinson a file containing court documents pertaining to Sneed, Sr.'s criminal history and name change. *Id*. Fisher expressed concerns regarding Sneed, Sr.'s continued presence in the FFA program, specifically Sneed, Sr.'s ability to drive students to competitions and practices. *Id*. Based on these concerns, Robinson contacted the District's legal and transportation departments and confirmed that, even with his criminal history, Sneed, Sr. could still volunteer and drive for AISD. *Id*. Robinson did not share the documents given to him by Fisher with anyone else. *Id*.

On October 15, 2018, Sneed, Sr. called Robinson regarding the rumors being spread in the community that Sneed, Sr. stole the tractor. *Id*. at 18. Sneed, Sr. and Parks also met with Dr. Shapiro regarding the rumors. *Id*. However, the District does not have the authority to punish or discipline anonymous adults for spreading rumors in the community. *Id*. Even so, Dr. Shapiro held a meeting with the adults believed to be involved in the rumors and asked them to stop for the sake of the students. *Id*.

On January 15, 2019, Robinson was informed that Sneed, Sr. and Parks did not join the FFA Booster Club. *Id*. at 19. Under the Club's regulations and procedures, the Club only bid on animals at auction if the student's parents joined, and paid dues. *Id*. In an attempt to be proactive, Robinson called to inform Parks of this rule. *Id*. Parks stated she was already aware, but that she disagreed with the practice – even though the Alumni Board had the same practice. *Id*. Two days

later, Sneed, Sr. called Robinson to complain about his phone call to Parks. *Id*. Robinson tried to explain to Sneed, Sr. that he was only attempting to avoid any future misunderstandings regarding the new Booster Club's operations, which further angered Sneed, Sr. *Id*.

On January 17, 2019, Officer Kirkov was informed that Rhorer was on school property. Exh. 14 at 9. After confirming the warrant was still active, Officer Kirkov arrested Rhorer, who subsequently made bail. *Id*. At that point, the further prosecution of Rhorer was up to the State of Texas and the Assistant District Attorney assigned the case. Exh. 1 at 191:20-194:3; Exh. 4 at 67:1-68:6.

The TCYS was held on January 25, 2019. Exh. 7 at 21. As a Junior Superintendent, Sneed was required to work the event and auction. Exh. 1 at 195:9-10; Exh. 18 at 11. Rhorer also attended the event. Exh. 1 at 194:4-22. After seeing Rhorer, Sneed reported this to security, who evicted Rhorer from the premises. *Id*. Even though the auction was sponsored and hosted by Travis County, it was still a District event, and Rhorer's CTW was in effect. *Id*. After Rhorer was evicted, one of Sneed's friends approached Sneed and told her Rhorer and another parent were gossiping about Sneed Sr.'s criminal history. *Id*. at 195:3-199:18. Sneed became upset and found Stephens. *Id*. Sneed proceeded to express her desire to confront the parent, who was still at the auction, about the gossip. *Id*. As Sneed was still in the process of working the auction as Junior Superintendent, Stephens attempted to calm Sneed and offered advice on how to handle difficult and frustrating situations. *Id*.; Exh. 18 at 11. Stephens told Sneed she would support any decision Sneed made – whether to stay or to leave – and brought Sneed some water. Exh. 18 at 11. Sneed stated she wanted to stay and complete her duties. Exh. 18 at 11. Stephens called Leos to inform her of what had occurred. *Id*.

Meanwhile, Sneed texted Parks her frustration over the incident. Text Messages, Exh. 45.

19

After Parks called and spoke with Sneed, Parks called Dr. Shapiro to inform him of the incident. Exh. 3 at 196:1-197:24. Dr. Shapiro called Robinson and Robinson, in turn, called Stephens. Exh. 7 at 21. After being briefed on the incident by Stephens, Robinson spoke to Sneed on the phone. *Id*. Robinson asked Sneed if she felt safe, which Sneed stated she did and that she intended to remain at the show to complete her responsibilities. *Id*. Robinson offered further encouragement to Sneed and told her to stay close to the teachers. *Id*.

Although Parks has since admitted that she was not present at TCYS that year, Parks informed Robinson, on or about the same day as the auction, that several Bowie students were dressed in camo and had a black substance smeared on parts of their faces. *Id*. at 22.; Exh. 3 at 190:20-23, 193:3-8. Parks asserted to Robinson that she overheard the students saying, "It's open season." *Id*. Parks reported to Robinson that she viewed the comment as a threat to her family and further reported that the students approached her and "got in her space." *Id*. Robinson reported this to Officer Melton, who conducted an investigation. *Id*.; "Fwd: Complaint," Exh. 46; AISD PD Report 19-000220, Exh. 47. Officer Melton spoke with Parks, Sneed, Sr., Sneed, several FFA students and their parents, and Stephens. Exh. 47. Officer Melton was able to ascertain the students had, in fact, come from duck hunting; did not approach or confront Parks (who was not there) or her family in any manner; and that the Deputy Constable working the event did not receive any reports of harassment at the event. *Id*.

***The 2019-2020 School Year.*** During her Senior year at Bowie, Sneed participated in FFA, Track, and MCAC. Exh. 1 at 24:3-8. Sneed was also the Secretary of the Bowie FFA chapter, and President of the MCAC. *Id*. Sneed does not plead any issues occurred her Senior year, and the evidence does not show that any complaints were made by Sneed or Parks. *See generally*, Dkt. No. 47.

## Argument & Authorities

**A.  Sneed has no evidence to support her municipal liability claim.[1]**

In order to impose municipal liability on AISD, Sneed must identify sufficient evidence to raise a genuine question of material fact that the (1) the alleged constitutional violation was caused as the direct result of the execution of an official custom or policy; (2) the custom or policy was approved or sanctioned by AISD's final policymaker; and (3) the custom or policy was the "moving force" behind the violation. *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1416 (5th Cir. 1997). To meet this burden, Sneed must show that the Board had actual or constructive knowledge of a persistent, widespread practice, of highly-similar violations of students' constitutional rights to be free from racially-based harassment, by AISD officials or employees, that was so common and well settled as to constitute a custom that fairly represented District policy. *See Eugene v. Alief Indep. Sch. Dist.*, 65 F.3d 1299, 1304 (5th Cir. 1995).

The Fifth Circuit defines a custom or official policy as:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [district] . . . or by an official to whom the [district] has delegated policy-making authority; or

2. A persistent, widespread practice of [district] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents [district] policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the district or to an official to whom that body had delegated policy-making authority.

*Id*. Under Texas law, a school district's elected board of trustees is unequivocally delegated the "exclusive power and duty to govern and oversee the management of the public schools of the district." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003); *see also* Tex.

---

[1] Austin Independent School District timely moved to dismiss Sneed's Section 1983 claim. *See* Dkt. Nos. 49, 54-55. The Court has yet to rule on this motion. Therefore, AISD moves for summary judgment without waiving its motion to dismiss.

Educ. Code § 11.151(b). Thus, the Board is AISD's final policymaker for the purpose of analyzing municipal liability. *See Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 759 (5th Cir. 1986). As shown below, the evidence does not support Sneed's claim.

      1.   <u>There is no evidence that shows the Board had actual or constructive knowledge of the alleged constitutional violations against Sneed.</u>

Sneed can point to no evidence that establishes the Board had actual or constructive knowledge of any of the alleged racially discriminatory conduct she asserts in her complaint. And that is the end of her Section 1983 claim.

      2.   <u>Even if the evidence showed the Board had actual knowledge (and it does not), Sneed cannot prove a persistent and widespread pattern of unconstitutional behavior by District officials or employees.</u>

Sneed fails to prove the necessary persistent and widespread pattern to demonstrate municipal liability. A pattern of <u>prior,</u> <u>highly similar</u> incidents is necessary to show both a customary policy and deliberate indifference. *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003); *McCully v. Cty. of N. Richland Hills*, 406 F.3d 375, 382-85 (5th Cir. 2005); *Valle v. City of Houston*, 613 F.3d 536, 548 (5th Cir. 2010). A pattern of prior incidents "must have occurred for so long or so frequently that the course of conduct warrants the attribution to [the Board] of knowledge that the objectionable conduct is the expected, accepted practice of [AISD employees]." *Peterson v. Cty. of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009). "A pattern requires similarity and specificity; prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in questions." *Id.* (internal quotations omitted). Further, a pattern requires "sufficiently numerous prior incidents, as opposed to isolated instances." *Id.* (internal quotations omitted).

Thus, Sneed must point to a sufficient pattern of prior instances of AISD failing to investigate racial bullying or harassment. *See Valle*, 613 F.3d at 549 (The Fifth Circuit "has been

wary of finding municipal liability on the basis of a single incident to avoid running afoul of the Supreme Court's consistent rejection of respondeat superior liability.") (citations omitted). Sneed has absolutely no evidence of any other AISD students being bullied or harassed based on their race, let alone that the District failed to investigate such claims. And that is because the evidence conclusively establishes that the District has adopted policies and trainings that pertain to the investigation of racial discrimination and bullying. *See* Exh. 8. Further, the evidence conclusively establishes that District employees follow through on investigating known complaints of student-on-student racial discrimination. *See generally* Exhs. 1, 3-7, 10, 17-18, 22-23, 32-37, 41-44, 46-47. This alone negates Sneed's ability to establish a pattern. *See Ratliff v. Aransas Cnty.*, 948 F.3d 281, 285 (5th Cir. 2020) ("[T]o plead a practice 'so persistent and widespread as to practically have the force of law,' [Sneed] must do more than describe the incident that gave rise to [*her*] injury.") (insertions and emphasis added). More importantly, however, Sneed can point to no evidence that the Board had knowledge that she was being bullied or harassed based on her race, nor that the Board had knowledge of any allegations contained in her complaint.

3. Even if Sneed could establish a persistent and widespread pattern of unconstitutional behavior known by the Board (and she cannot), the evidence conclusively establishes that AISD did not act with deliberate indifference.

To establish deliberate indifference, Sneed must show that AISD was more than ineffective or negligent in responding to known constitutional violations. *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 454, 458 (5th Cir. 1994); *see also Hagan v. Houston Indep. Sch. Dist.*, 51 F.3d 48, 52 (5th Cir. 1995). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *McCully*, 406 F.3d at 381 (internal quotations omitted). Quite plainly, Sneed can point to no evidence that involves the Board, let alone evidence that the Board was deliberately indifferent to her complaints.

**B.  The undisputed evidence shows that Sneed cannot support her Title VI claim.**

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Sneed alleges the District violated Title VI by failing to adequately address the alleged harassment and bullying she encountered from other students. *See generally* Dkt. No. 47; Exh. 1 at 23:6-13, 32:10-13, 36:6-13, 37:5-38:7, 51:23-52:7, 54:16-20, 79:16-21, 88:24-89:14.

The Fifth Circuit has applied "the deliberate indifference standard to claims of liability arising from student-on-student harassment." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015). Therefore, AISD may be liable for student-on-student harassment only if "(1) the harassment was 'so severe, pervasive, and objectively offensive that it can be said to deprive [Sneed] of access to educational opportunities or benefits provided by the school' (a racially hostile environment), and the district (2) had actual knowledge, (3) had 'control over the harasser and the environment in which the harassment occurs,' and (4) was deliberately indifferent." *Id.* at 408-09 (additions added).

> 1.  The evidence shows that Sneed did not experience a racially hostile environment, within the meaning of Title VI.

The evidence conclusively establishes that the only behavior that could be perceived as race-based was the alleged use of the n-word, by other students – that was never directed at Sneed – and the student section leader touching Sneed's hair and remarking that it was weave. *See* Factual Background *supra.* And that is not enough to establish a racially hostile environment. *Fennell*, 804 F.3d at 409 ("For the harassment to be so severe, pervasive, and objectively offensive, the harassment must be more than the sort of teasing and bullying that generally takes place in schools.") (internal citations and quotations omitted). Sneed can point to no other evidence that

supports her claim that the other allegations of bullying or harassment found in her complaint were

based on her race. *See* Factual Background *supra*. That is because the evidence conclusively

establishes that:

- D., who exclaimed, "Y'all's hair looks like shit" was speaking to Sneed, who is African American, but also another Hispanic student. Exh 1 at 45:1-51:22; Exh. 3 at 47:13-16.

- Parks, rather than Sneed, heard the n-word being used by FFA students in December of 2016. Exh. 10 at 6; Exh. 3 at 24:1-4, 25:1-7.

- The same FFA students who used vulgar language around Sneed or Parks, used the same language to the (white) teachers. Exh. 1 at 81:25-82:18.

- Sneed was given the "Sass-quatch" award because she is sassy, not because she is Black. Exh. 1 at 58:18-21. Further, Sneed is not the only African American student in Band, or even within the Percussion section. *Id*. at 41:1-5, 53:13-18, 64:3-4.

- The feedbag that was hung in the barn was a Halloween decoration and not directed at Sneed. Exh. 7 at 8; Exh. 18 at 5.

- The phallic representation carved on Sneed's feed scoop was not racial, and other (white) students were also harassed and their equipment vandalized. Exh. 1 at 92:19-95:22.

- All but two of the 2018-2019 FFA officer candidates – who were white or Hispanic – were unable to perform their speeches with props. *Id*. at 131:7-21.

- The decision to allow Sneed's horse judging teammates to compete was made so that Sneed would not be disqualified, and not because she is Black. Exh. 18 at 6.

- Sneed was excluded by some of the FFA officers and labeled a snitch because she tattled on her fellow officer, and not because she was Black. *Id*. at 8-9; Exh. 7 at 13; Exh. 1 at 156:9-14. In fact, a white student had been excluded for the exact same action the prior year. Exh. 1 at 159:2-10.

- Stephens providing support and encouragement to Sneed at TCYS was not racially motived. Exh. 18 at 11; Exh. 1 at 198:7-199:18.

- All complaints regarding the dissolution of the Alumni Board, the stolen tractor, and Sneed, Sr.'s criminal history did not concern Sneed, herself, and there is no evidence that this rumor mill was racially motivated. Exh. 7 at 16-18; Exh. 18 at 10; Exh. 1 at 178:16-179:25; Exh. 41.

Further, even assuming Sneed hearing the n-word said created a racially hostile

environment, Sneed can point to no evidence that this harassment "deprived [her] of access to the

educational opportunities or benefits provided by the school." *Fennell*, 804 F.3d at 410. "The harassment must have a concrete, negative effect on [Sneed's] education, such as creating disparately hostile educational environment relative to [Sneed's] peer, forcing [Sneed] to change […] her study habits or to move to another district, or lowering [Sneed's] grades." *Id.* (additions and omissions added) (internal quotations and citations omitted). To the contrary, the evidence conclusively establishes Sneed maintained consistently high grades during her time at Bowie. Exh. 1 at 13:13-14:24; Exh. 2 at 12:13-13:10; Exh. 3 at 34:10-18. She participated in numerous extra-curricular activities, such as FFA, Band, Volleyball, MCAC, and Track. Exh. 1 at 24:3-12, 26:11-27:15, 29:16-30:10. Further, she held officer positions in numerous organizations, including Bowie's FFA chapter, the District-wide FFA chapter, and Bowie's MCAC. *Id.* Sneed has also been admitted to study at LSU to pursue her dream of becoming a veterinarian. *Id.* at 13:13-14:24.

Although Sneed pleads that she suffered sleep apnea, loss of appetite, and inconsolable crying, the evidence does not support this. Better Path Family Counseling Records, Exh. 48; Glasshouse Effect Psychotherapy Records, Exh. 49. The evidence, however, does conclusively establish that any offering of mental health assistance by the District was declined. Exh. 1 at 200:9-23; Exh. 7 at 10; Exh. 23 at AISD88. There is simply no evidence that Sneed was deprived of educational opportunities sufficient to support her Title VI claim. And this dooms her claim.

2. Even if the evidence established a racially hostile environment (and it does not), the evidence conclusively establishes that the District did not act with deliberate indifference to allegations that were reported.

"Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999). In the school context, an administrator is not deliberately indifferent simply because they choose one course of discipline over another. *Sanches v. Carrollton-Farmers Branch*

26

*Indep. Sch. Dist.*, 647 F.3d 156, 167-68 (5th Cir. 2011) ("Schools are not required to remedy the harassment or accede to a parent's remedial demands, and courts should refrain from second-guessing the disciplinary decisions made by school administrators.") (internal quotations and citations omitted). This recognizes the simple practical reality that, when one student's conduct impacts another's, the District has to balance the rights and interests of both." *See I.L. v. Houston Indep. Sch. Dist.*, 776 F. App'x 839, 842-44 (5th Cir. 2019); *E.M. v. Austin Indep. Sch. Dist.*, 2018 WL 627391 (W.D. Tex. Jan. 30, 2018), *aff'd*, 770 F. App'x 712 (5th Cir. 2019). Importantly, the Fifth Circuit has found that school officials do not have a constitutional duty to prevent further harm to a student. *See Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 218 (5th Cir. 1998).

What is more, the Fifth Circuit has held a school district can only be held liable if an appropriate school official, with authority to supervise and take action to end such abuse, had actual knowledge of the abuse but failed to take action. *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th Cir. 1997); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) ("Congress modeled Title IX after Tile VI…and passed Title IX with the explicit understanding that it would be interpreted as Title VI was."). This knowledge requirement omits "the bulk of employees, such as fellow teachers, coaches, and janitors…" *Id*. Therefore, any evidence that Sneed, Parks, or Sneed, Sr. reported racial harassment to a teacher or coach – including Paxton, Stephens, Dickinson, Pierce, or Black – does not impute knowledge of the harassment on to an appropriate school official with authority to take action on behalf of the District. *See generally* Exhs. 1-3.

Nevertheless, as detailed in the facts, the evidence conclusively establishes that every complaint made by Sneed, Sneed, Sr., or Ms. Parks – regardless if the complaint was about behavior due to race, or behavior that was not directed at Sneed herself – was addressed by the

District. *See* Factual Background *supra*. Sneed did not report any incidents herself, but rather relied on her mother to report any issues to administration. *Id*. This would often cause a delay in the report, which would hinder the ability of administrators to investigate the allegation thoroughly. *Id*. And, yet, every complaint made was investigated by either Leos, Robinson, or another AP. *Id*. As a result, when substantiated, students were appropriately disciplined and Rhorer was arrested. *Id*. Ultimately, after conducting investigations into each complaint, none were found to meet the definition of bullying based on race and, therefore, none were escalated to the District's Title VI Coordinator. Exh. 4 at 91:11-20, 97:8-21; Exh. 5 at 21:25-16.

Insofar as Sneed relies on her allegation that the District failed to comply with its own policies or procedures, "[a] school district's failure to promulgate policies or to comply with its procedures 'does not establish the requisite actual notice or deliberate indifference.'" *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). Therefore, even if the evidence established that the District failed to comply with its own procedures regarding investigating Title VI (and it does not), this is insufficient to establish deliberate indifference.

## **Prayer**

Austin Independent School District requests that the Court grant its Motion for Summary Judgment and dismiss all of Sneed's claims against it, with prejudice. The District further requests that the Court award it all taxable costs of Court and any and all other relief to which it may be justly entitled.

Respectfully submitted,

ROGERS, MORRIS & GROVER, L.L.P.

_____
JONATHAN G. BRUSH
Attorney-in-Charge
State Bar No. 24045576
Fed. I.D. No. 619970
Email:  jbrush@rmgllp.com
AMY DEMMLER
State Bar No. 24092337
Fed. I.D. No. 3227731
Email:  ademmler@rmgllp.com
5718 Westheimer, Suite 1200
Houston, Texas 77057
Telephone:     713/960-6000
Facsimile:     713/960-6025
ATTORNEYS FOR AUSTIN INDEPENDENT
SCHOOL DISTRICT

### Certificate of Service

I hereby certify that on July 10, 2020, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Martin J. Cirkiel
*(Via Email:* marty@cirkielaw.com)

Anthony O'Hanlon
*(Via Email:* anthony@ohanlonlaw.net)

_____
Counsel for Austin ISD