**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **CAMRON SNEED,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| v. | § | C.A. NO.: 1:19-cv-608 |
| | § | |
| **AUSTIN INDEPENDENT** | § | |
| **SCHOOL DISTRICT,** | § | |
| | § | |
| *Defendant*. | § | |

**AUSTIN INDEPENDENT SCHOOL DISTRICT'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Austin Independent School District (AISD or the District) files its Proposed Findings of Fact and Conclusions of Law as follows:

### I.   *Proposed Findings of Fact*

1.  In a joint jury trial waiver, filed on November 2, 2020, the Parties in this matter agreed to a bench trial. *See* Dkt. No. 105. Evidence was heard by the Court from December 7 through 9, 2020. *See* Dkt. No. 107.

2.  Camron Sneed brought claims against the District under Section 1983 and Title VI based on numerous allegations of alleged racial discrimination she asserts occurred while she attended Bowie. On the District's motion, the Court has already dismissed Sneed's Section 1983 claim. *See* Dkt. No. 79. Further, on the District's motion for summary judgment, the Court dismissed a majority of the factual allegations Sneed made in support of her Title VI claim, finding the District did not act with deliberate indifference towards Sneed's rights.

*See* Dkt. No. 83. As such, the only remaining allegations that are before the Court on Sneed's Title VI claim are: (1) the receipt of the "Sass-quatch" award; (2) racial slurs used by FFA students on December 14, 2016; and (3) racial graffiti supposedly seen on two occasions, in a bathroom and at the Farm.

     3.     Sneed is an African American female and a graduate of James Bowie High School (Bowie). Her mother is Pamela Parks and her father is Charles Sneed. Sneed currently attends Louisiana State University (LSU) and is studying Agricultural Science (Ag) and plans to pursue a career as an equine veterinarian.

     4.     Bowie is a high school within AISD. Administrators at Bowie strive to uphold and instill values of inclusivity at the school. Cultural proficiency is identified as a core value at Bowie (as well as the District overall) and is incorporated into documents and presentations given during professional development meetings with staff. Teachers and administrators at Bowie support multiple student cultural events throughout the year, including, but not limited to Black History Month, Hispanic Heritage Month, and African American Heritage Awards celebrations.

     5.     Sneed attended Bowie from 2016-2020. While a student at Bowie, Sneed participated in multiple extra-curricular activities, including Band, Future Farmers of America (FFA), Track, Volleyball, and the Multi-Cultural Awareness Club (MCAC). MCAC is a club made up of a diverse group of students, from different ethnicities and races, that organize various multicultural events and programs throughout the school year that the entire student body voluntarily attends. Sneed held an officer position in Bowie's FFA her Junior and Senior year and was the President of the MCAC her Senior year. Additionally, Sneed

held an officer position in the district-wide State FFA chapter her Senior year. Further, Sneed was the recipient of the FFA Lone Star Award, a top FFA honor within the State of Texas. Even with a busy schedule of extra-curriculars, Sneed consistently maintained good grades.

***The "Sass-quatch" Award.***

6.     At the end of each school year, the Bowie Band program traditionally holds a banquet. At this banquet, various awards are presented to students. Some awards are chosen and presented by Bowie staff, and some awards are chosen and presented by section-leaders, who are upperclassmen (i.e. Seniors and occasionally Juniors). The student awards are typically funny or sarcastic and are not reviewed by staff prior to the banquet.

7.     Sneed was a member of the percussion section, specifically the Front Ensemble. During Sneed's Freshman year, the student Front Ensemble section-leaders were L.A. (a Senior) and J.H. (a Junior), who created and presented end-of-the-year awards to students within the Front Ensemble. The banquet that year was held on April 29, 2017.

8.     At the banquet, L.A. and J.H. presented Sneed with the "Sass-quatch" award in the form of a certificate and a trophy. L.A. was responsible for the name of the award. The certificate itself states the reason for the award: "For being one of the absolute sassiest members of the Front Ensemble. There is no denying your impressive ability to make any other member of the F.E. either jealous or enraged at your ability to make split-second savage remarks. Great job, what a [feat]."

9.     The award was not racial in nature. However, Sneed found the award offensive. Even so, neither Sneed (nor her parents) reported her concerns with the award to any appropriate school official, at the time.

3

10. The following school year, during the middle of the Fall 2017 semester, Parks met with Mark Robinson, the new Principal of Bowie, and discussed numerous complaints – some racial, some not – including her own discomfort with the "Sass-quatch" award from the prior year.

*Use of Racial Slurs by FFA Students.*

11. During Sneed's Freshman year, the Ag and FFA teachers were Brad Pierce and Tiffany Black. During Sneed's Sophomore through Senior years, the Ag and FFA teachers were Amber Dickinson and Shelby Stephens.

12. The Ag and FFA programs at Bowie utilize a piece of property located near Bowie's campus, called the Farm. The Farm has paddocks, barns, pig and hen pens, and other structures that help Ag and FFA students learn to raise and care for animals. During Sneed's Freshman year, the Farm was owned by a private individual who lived on the Farm and who granted access and use of the property to Bowie's Ag and FFA programs. During Sneed's Sophomore year, the District purchased the property.

13. After school, on December 14, 2016, during Sneed's Freshman year, Pierce was conducting "Pig Church." Pig Church was an exercise directed by Pierce with Ag and FFA students who were raising pigs in the program. It was essentially a mock auction show, held in an arena at the Farm, to help students learn how best to show their pigs.

14. Parks drove Sneed to the Farm after school that day. Upon arrival, Sneed exited the vehicle, retrieved her pig from its pen, and joined the other students and Pierce in the arena. Parks exited the vehicle after Sneed and walked towards the arena where Sneed was

already participating in Pig Church. Parks noticed a group of male students standing outside of the arena and claims to have heard them using the "n-word" and other vulgar language.

15.     Sneed and Pierce were out of earshot and did not hear the alleged racial and vulgar language used by the students, as the arena is quite large. Parks verified that Sneed could not hear the language after she looked at Sneed and noticed that she seemed unbothered and engrossed in Pig Church. Parks also verified that Pierce could not hear the language, because, after Parks attempted to get Pierce's attention by shouting out to him, Pierce appeared to remain focused on teaching the students.

16.     As such, Parks decided to confront the students directly about their language. Parks alleges that the students then called her a "bitch." At that time, Parks pulled Sneed from the arena and told her to put her pig and equipment away because they were leaving. As she owed Sneed an explanation for prematurely removing her from Pig Church, Parks told Sneed what she heard the other students saying and the language they used.

17.     Parks emailed Susan Leos, the Interim Principal at the time, regarding the language that she heard the students use, as well as about general concerns regarding an apparent lack of communication with Sneed's Volleyball and Band teachers. Parks also called Black, who was not present at the time, to report the behavior.

18.     Leos spoke with Parks the next day to discuss the incident. An investigation was conducted – Pierce verified he did not hear any student using the "n-word" and various FFA students were interviewed, but no one could identify which students used the "n-word." And Parks could not identify or otherwise provide the name of the students either.

19. Leos further reached out to Sneed's Volleyball and Band teachers regarding Parks' comments regarding their lack of communication, as reported by Parks.

20. On December 19, 2016, Leos and Vincent Trevino, a former Assistant Principal at Bowie, held a meeting with the FFA Alumni Board, which consisted of parents and community members who supported the FFA program. During this meeting, student misbehavior and disrespect was addressed, including vandalism, inappropriate language, and theft. Leos and Trevino stressed to the parents that, often, witnesses would not report misbehavior, which would deny the school the ability to rectify the situation. Parks was able to speak at this meeting and explained what she witnessed on December 14, 2016. The other parents seemed shocked that any of the students would use the "n-word" and apologized that Parks heard that type of language. Following this meeting, in an effort to curb student misbehavior at the Farm, a curfew was instated, campus police were instructed to patrol the Farm more frequently, the school's disciplinary procedures were reviewed with parents, and parents were asked to report any misbehavior they saw, or otherwise encourage their students to do so.

21. Pierce and Black never heard FFA students using the "n-word" and, outside of December 14, 2016, Sneed or Parks never reported such misbehavior. Further, Dickinson and Stephens never heard FFA students using the "n-word" and neither Sneed nor Parks ever reported such misbehavior to them, either.

*Racial Graffiti.*

22. While attending Bowie, Sneed asserts that she saw the "n-word" written on two occasions at two different locations on the Bowie campus.

23. During her Freshman year, Sneed asserts she saw the "n-word" and other general graffiti (i.e. student initials, random symbols, etc.) on the entrance door to the FFA Barn. Sneed did not know who had written the "n-word" or when. Further, Sneed did not report the existence of this graffiti to an appropriate school official, and Bowie administrators and teachers deny ever seeing, or receiving reports of, racial graffiti at the Barn. If Bowie administrators knew of the graffiti, they would have taken appropriate action to remove or otherwise cover-up the graffiti. Sneed admits that any investigation would be pointless as there was no way to identify the perpetrator.

24. Additionally, as Sneed supposedly saw this graffiti at the Barn during her Freshman year, the removal was outside of the District's control, as it did not own the property at that time and, therefore, the District could not exercise complete management over the property – like installing cameras, repairing broken windows and boards, and removing graffiti.

25. During either her Sophomore or Junior year, Sneed asserts that she saw the "n-word" written in the stall of a girl's restroom located near the Band hall that Sneed was using to change for track practice on that one occasion. Again, Sneed did not know who had written the "n-word" or when. Further, Sneed also did not report the existence of this graffiti to any appropriate school official, and Bowie administrators and teachers deny knowledge of racial graffiti in the bathrooms at Bowie. If Bowie administrators knew of the graffiti, they would have taken appropriate action to remove or otherwise cover-up the graffiti. Sneed even agrees that there was nothing the school could have done because there are no cameras in the restrooms.

## II. Proposed Conclusions of Law

*Title VI – In General.*

1. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C § 2000d. Title VI is a statute designed to stop intentional race discrimination and, therefore, Sneed must prove that the District intended the alleged racial discrimination she received from other students.

2. The Fifth Circuit has applied "the deliberate indifference standard to claims of liability arising from student-on-student harassment." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015). Therefore, AISD may be liable for student-on-student harassment only if "(1) the harassment was 'so severe, pervasive, and objectively offensive that it can be said to deprive [Sneed] of access to educational opportunities or benefits provided by the school' (a racially hostile environment), and the district (2) had actual knowledge, (3) had 'control over the harasser and the environment in which the harassment occurs,' and (4) was deliberately indifferent." *Id*. at 408-09 (additions added).

3. "Peer harassment is less likely to support liability than is teacher-student harassment." *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 166 (5th Cir. 2011). "[T]o be actionable, the harassment must be more than the sort of teasing and bullying that generally takes place in schools; it must be so severe, pervasive, and objectively unreasonable." *Id*. at 167.

4. The Fifth Circuit has also held a school district can only be held liable if an appropriate school official, with authority to supervise and take action to end such abuse, had actual knowledge of the abuse but failed to take action. *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th Cir. 1997); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) ("Congress modeled Title IX after Title VI…and passed Title IX with the explicit understanding that it would be interpreted as Title VI was."). As a matter of law, teachers, coaches, and janitors are not appropriate persons for purposes of establishing knowledge on the part of the District. *Id.* at 660.

5. Further, deliberate indifference is a high burden. "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference." *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999).

6. In the school context, an administrator is not deliberately indifferent simply because they choose one course of discipline over another. *Sanches*, 647 F.3d at 167-68. When one student's conduct impacts another's, the District is obligated to balance the rights and interests of both. *See I.L. v. Houston Indep. Sch. Dist.*, 776 F. App'x 839, 842-44 (5th Cir. 2019); *E.M. v. Austin Indep. Sch. Dist.*, 2018 WL 627391 (W.D. Tex. Jan. 30, 2018), *aff'd*, 770 F. App'x 712 (5th Cir. 2019). As such, "[s]chools are not required to remedy the harassment or accede to a parent's remedial demands, and courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.* Further, school officials do not have a constitutional duty to prevent further harm to a student. *See Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 218 (5th Cir. 1998).

***Legal analysis of the District's liability to Sneed based on her receipt of the "Sass-quatch" award.***

7. As a threshold matter, there is nothing overtly racial about the "Sass-quatch" award – i.e. it is not direct evidence of racial discrimination. Clearly, as stated on the certificate itself, the award was not presented based on Sneed's race, but rather her "sassy" attitude, which was considered by L.A. and J.H. to be a favorable attribute of Sneed. Further, online sources describe Sasquatch, or Big Foot, as a large, hairy, humanlike creature akin to the Yeti or Abominable Snowman from Himalayan folklore. https://www.britannica.com/topic/Sasquatch. As such, while Sneed perceived the award as racial and found it offensive, it is reasonable to assume that not all students and teachers would.

8. However, even if such an award were actionable under Title VI, Sneed did not complain about the award to any appropriate school official.

9. It was not until the following year – some 6 months later – that Parks reported to Robinson her own discomfort regarding the award, in addition to various other concerns she had. Title VI does not require Robinson to initiate a full investigation into Parks' complaint about a racially ambiguous award given the previous year, specifically because Robinson no longer had control of the alleged bad actor – L.A., who chose the name for the award – as she had already graduated at that point. *See Fennell*, 804 F.3d at 411 (finding a school district's response weak but not deliberately indifferent when a shoelace noose was placed in the plaintiff's locker and the offending student was only forced to run laps); *see also Alton*, 168 F.3d at 201; *I.F.*, 915 F.3d at 377; *Sanches*, 647 F.3d at 167-68.

10. Further, even if Sneed or Parks had immediately reported their concerns about the award to, say, Ryan Thomas (the Band Director at the time), under Fifth Circuit precedent, Thomas is not considered an appropriate official, as he was a teacher, rather than an administrator. *See Rosa H.*, 106 F.3d at 660.

11. As such, the District did not have the requisite actual knowledge required to trigger its duty under Title VI. And, without requisite knowledge, the Court finds that the District could not (and did not) act with deliberate indifference towards the "Sass-quatch" award.

***Legal analysis of the District's liability to FFA students using racial slurs.***

12. Based on the evidence, it is apparent that Parks, and not Sneed, heard FFA students using the "n-word" during Pig Church, on December 14, 2016. As Title VI is an intentional discrimination statute that protects students, Parks' experience of offensive behavior cannot be used to establish an injury on Sneed's part. Therefore, as a matter of law, this allegation of harassment cannot support Sneed's Title VI claim against the District.

13. Even if Sneed, herself, had heard students using the "n-word" on that day, following Parks reporting the misbehavior, an investigation was conducted. Students were questioned, but Leos and Trevino could not identify the student (or students) who used the "n-word." Additionally, the teacher present at the time, Pierce, reported that he did not hear students using the "n-word." Therefore, discipline against a specific student could not be taken. However, Leos and Trevino held a meeting with FFA parents and volunteers five days later to discuss misbehavior occurring on the Farm, including the use of inappropriate language. Parks was even allowed to speak about her experience from December 14, 2016.

14. As such, the Court finds that the District did not act with deliberate indifference towards the use of racial slurs by FFA students on December 14, 2016.

*Legal analysis of the District's liability to the alleged racial graffiti.*

15. As a matter of law, a few instances of racially motivated graffiti cannot establish a racially hostile environment. *See Collier v. Dallas Cnty. Hosp. Dist.*, 805 F. App'x 306 (5th Cir. 2020). In *Collier*, an African American former employee filed suit under Title VII alleging he was fired in retaliation for complaining of racial discrimination and that the hospital was a hostile work environment. In support of his claim, Collier provided evidence that he reported to a supervisor and human resources that the "n-word" was scratched into an elevator (and only removed months after he complained), two swastikas were drawn on the wall of a storage room he worked in (and only painted over after eighteen months following his complaint), and that nurses called him and other African American employees "boy." *Id.* at 805 F. App'x at 311. The district court found this was not sufficient to constitute a hostile work environment, and the Fifth Circuit agreed. *Id.* In doing so, the Fifth Circuit found that the conduct "was not physically threatening, was not directed at [Collier] (except for the nurse's comment), and did not unreasonably interfere with his work performance." *Id.*

16. Although *Collier* dealt with an employment dispute under Title VII, the legal analysis is comparable to Sneed's claim that the District violated Title VI because she saw, on two occasions over four years, racial graffiti. The essence of Title VI forbids the result that a school district can be held liable under this intentional discrimination statute merely for isolated instances of graffiti.

17. However, even if isolated instances of graffiti were actionable under Title VI, Sneed did not report either of the instances of graffiti to a school administrator and admits that she did not know who was the perpetrator, how long the graffiti had been there, and what (if anything) the school could have done, as there were no cameras in the bathroom or at the Farm.

18. Further, no other administrator, or even teacher, at Bowie saw or otherwise knew about any racial graffiti anywhere on campus. And each testified that, if they had seen such graffiti, it would be removed immediately.

19. As such, the District did not have the requisite actual knowledge required to trigger its duty under Title VI. And, without the requisite knowledge, the Court finds that the District could not (and did not) act with deliberate indifference towards the racially motivated graffiti found by Sneed.

***No racially hostile environment.***

20. Even if the District did act with deliberate indifference (and it did not), three instances of alleged racial harassment (one of which is racially ambiguous), over one or two years, is insufficient to establish that the alleged harassment was "severe and pervasive." *See Fennell*, 804 F.3d at 409 (finding racially offensive remarks and actions spanning over three or four years constituted severe and pervasive); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000), *abrogated on other grounds*, *Burlington Northern & Sante Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (finding racially offensive remarks made every few months over three years was sufficient to constitute severe and pervasive); *DiStiso v. Cook*, 691

13

F.3d 226, 243 (2d Cir. 2012) (finding the use of the n-word approximately eight to fifteen times over a school year raised a question of whether the name-calling was severe or pervasive).

21.     Moreover, it is clear that Sneed was not deprived of access to educational opportunities or benefits provided by the school because of the three allegations of harassment. "The harassment must have a concrete, negative effect on [Sneed's] education, such as creating a disparately hostile educational environment relative to [Sneed's] peer, forcing [Sneed] to change […] her study habits or to move to another district, or lowering [Sneed's] grades." *Id*. at 410.

22.     Throughout her time at Bowie, Sneed's grades remained consistently high and she participated in numerous extra-curricular activities, holding officer positions in FFA and MCAC. Based on her high school performance, Sneed now attends college at LSU and is pursuing her dream of becoming a veterinarian.

23.     Although Sneed eventually started seeing a licensed counselor, this was not until 2019 – years after the three instances of alleged harassment occurred and mere months before the lawsuit was filed. Further, records reflect that Sneed's initial appointment with Tina Rix was February 4, 2019, but that the next sessions were not until January through April of 2020. Sneed also saw another provider, Bolutife Dosumu, on July 6 and 20, 2019, but did not return.

24.     Further, there are various other life stressors that are noted in the counseling records that necessitated the need for counseling and Sneed's diagnosis of depression. For example, the records indicate that Sneed was stressed and depressed because of her

14

demanding academic and extra-curricular schedule and the need to be perfect, as well as the global pandemic caused by COVID-19 making her Senior year unpredictable. Additionally, records from Sneed's counseling sessions establish that her depression, frustration, and stress from any racial harassment stemmed from the actions by one particular student – Kylie Rhorer. However, all allegations concerning Rhorer's actions were previously dismissed, as the Court found that the District did not act with deliberate indifference towards any reported behavior concerning Rhorer. *See* Dkt. Nos. 77, 83.

25. Additionally, Parks' health had been deteriorating and Parks herself, in a press conference given after the filing of the lawsuit, stated that she does not know how long she has to live. Facing the apparent imminent death of her mother could absolutely be the cause of Sneed's stress and depression.

26. Sneed did not lose any educational opportunities due to receiving the "Sass-quatch" award, hearing that her mother heard other FFA students use the "n-word" on one occasion, and seeing racial graffiti on the Bowie campus twice. As such, the Court finds that a racially hostile environment did not exist and the District is not liable under Title VI towards any of the allegations brought by Sneed.

27. Based on the District's response to all allegations as a whole, including those previously dismissed by the Court, the District did not act with deliberate indifference towards Sneed's rights under Title VI.

28. Based on the foregoing, the Court finds judgment is appropriate for the District and it is ordered that Sneed takes nothing.

29. All appropriate costs are taxed against Sneed.

Respectfully submitted,

ROGERS, MORRIS & GROVER, L.L.P.

_____
JONATHAN G. BRUSH
State Bar No. 24045576
Federal I.D. No. 619970
Email: jbrush@rmgllp.com
AMY DEMMLER
State Bar No. 24092337
Federal I.D. No. 3227731
Email: ademmler@rmgllp.com
ROGERS, MORRIS & GROVER, L.L.P.
5718 Westheimer, Suite 1200
Houston, Texas 77057
Telephone: 713/960-6000
Facsimile: 713/960-6025

ATTORNEYS FOR AUSTIN ISD

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2020, a true and correct copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Martin J. Cirkiel
*(Via Email:* marty@cirkielaw.com)

Anthony O'Hanlon
*(Via Email:* anthony@ohanlonlaw.net)

_____
Attorney for AISD