IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CAMRON SNEED, | § | |
|     Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | Civil Action No. 1:19-cv-608 |
| | § | Jury Trial |
| AUSTIN INDEPENDENT SCHOOL | § | |
| DISTRICT, | § | |
|     Defendant. | § | |

**PLAINTIFF'S PROPOSED FINDINGS OF FACTS**

A.     GENERAL

1. Camron was born on March 20, 2002; she is of African-American heritage. Her natural mother is Pamela Parks-Sneed. Her natural father is Charles Sneed. Camron wants to be a veterinarian and is currently attending LSU (Louisiana State University). (Trial testimony)

2. Camron attended Bowie High School ("BHS") (in the Austin Independent School District) beginning Fall 2016 as a Freshman and graduating in May 2020. She participated in the Future Farmers of America ("FFA") Program all 4 years; after her Freshman Year she was the only African-American in the program. She was also a member of the School Band during her freshman and sophomore years. (Trial testimony)

3. Throughout the four-year period, she heard racial epithets on a daily basis and often multiple times per day by FFA Members. She heard them from FFA students in class, at the FFA farm and at school events. Both of her parents also heard racial epithets from students in the FFA program. The School Principal, Mr. Robinson, admitted that he had more problems with the FFA Program than any other at the High School. (P-3-58).

4. Graffiti (with racial epithets) was on the walls of the high school bathrooms and written on windows. The graffiti was easily observable by teachers, coaches and administration. (Trial testimony)

5. Against the backdrop of ongoing racial epithets (her freshman year), the Bowie High School band presented her with the "Sass Quatch Award", at its annual awards banquet. Camron found this award racially offensive, and particularly embarrassing because it occurred in front of so many people. (P-59).

1

B.      THE RACIALLY HOSTILE ENVIRONMENT AFFECTED HER H.S EXPERIENCE

**FFA**

6. Camron became scared to go the FFA Farm. Mrs. Parks-Sneed told her daughter not to go the Farm alone. (P-43) Over time, Camron saw not only herself but her family as targets as well. On one occasion an FFA student said "I'm so fucking mad I could kill a nigger" while she and her mother were nearby. (Trial testimony)

7. On one occasion she walked onto the Farm and many of the offending FFA students opened their knives at the same time. The students were admonished by the teacher to put the knives away, but they did it again when the teacher left. (Trial testimony)

8. Administrators were well aware of ongoing reports of: property damage, graffiti carved onto farm equipment, animal cruelty, stolen animals and physical mishandling of pigs and cows, (P-42 – P-50). This added to Camron's fears. (Trial testimony)

9. Threats of physical violence became real when students with the FFA program carved male genitalia on Camron's tack (including her feed troughs and feed scoops). (P42 & P43, P-92-P-96) FFA Students also grafittied racial slurs in the FFA barn, easily observable to any staff member who went to the farm. (Trial testimony)

10. Camron's fears that her animals would be injured also became realized when former FFA member, Kylee Rhoher, vandalized Camron's feed equipment, carved a penis on her farm equipment, then injured her show animals. Afterwards, Camron complained, and charges were filed against Kylee; Kylee's family then harassed Camron's parents at a livestock show. (P41- P49, P-91- P-95). Mrs. Park testified that, at the same livestock show, a group of FFA students showed up wearing camouflage military gear. They then went into the bathroom and put black shoe polish on their faces and came out and specifically walked past Camron's parents. (P-55 & P-56; and Trial testimony)

11. When listening to rap music in Camron's presence, and the term "Nigger" was heard, students accentuated the "rrrrrrr." (Trial testimony)

12. In the Fall of 2017 Camron went to the FFA Farm and observed a white feedbag, stuffed to look like a head and tied around the neck to look like a hanging in the barn. (P-7). It was put up by FFA students. This image was sent around the school via social media. Camron's family notified the school. (P-7)

13. After the bag was taken down, FFA students purposefully put trash in Camron's feed area (for the pigs). They also put the noose by her feed troughs. She threw it in the trash. FFA students then removed the noose from the trash and put it back by her trough again. (Trial testimony)

14. Months later in January 2018, a noose was hung in the FFA barn, making a clear imagery statement. (P-54)

15. One FFA student, Will Gamblin, continually used racial epithets in Camron's presence. On one occasion he proudly used the term "Noodle Nigger". Camron was particularly offended because he said it to her directly. (P-8 – P-14, P-36, P-54)

16. Camron has hair unique to persons of African-American descent. White students would touch her hair and make offensive comments about her hair at the same time. In fact, Dr. Shapiro, the (former) Associate Superintendent of Schools admitted it was offensive. (P-75)

## GRAFITTI

17. In addition to the graffiti at the ag farm, racially offensive graffiti was in the high school bathrooms throughout Camron's 4 years at Bowie High School. It was readily apparent to anyone who looked. (Trial testimony)

## BAND

18. After AISD presented Camron the "Sass quatch" award her freshman year, her parents spoke with the band director, who apparently approved of the printed award certificate. (P- 58). They later spoke with Principal Robinson about the award and ongoing concerns with the use of racist language in band, and in the school in general. (Trial testimony)

19. While in the band, Cameron heard racial epithets on a daily basis, even after the students were admonished. (P-3-58). She eventually quit the band because of the hostility, in her sophomore year. (Trial testimony)

20. Mr. Robinson, Bowie High School Principal, recognized the hostile environment and suggested she move to another high school. (P-79). He recognized Camron had a right to a safe environment "not filled with that type of language and words." But nothing changed at Bowie High School. (Trial testimony)

## EFFECT

21. Due to the unchecked racially hostile environment, Camron became introverted, and saw a private therapist, and was diagnosed with depression. (P-77 – P-79; P-60 – P-63). In fact, in order to "hide-out" she started wearing a hoodie and covered herself up with the hope of not being recognized. (Trial testimony)

22. Even though she, her mother and father made numerous complaints about the students in the FFA program, she could tell the FFA Students were not effectively punished, because the harassment continued. (P-5 – P-60). She stopped trusting her teachers because reporting the racial animus she experienced became futile and seemed to lead to more harassment. (P-43).

23. Camron was deeply affected by the racial hostilities, and the school's failure to effectively

3

address it. She put on a brave face to fight through it; she maintained her good grades. But she lost sleep, lost weight, became depressed, was forced to consider changing schools, and was robbed of happy high school memories. (Trial testimony)

C.  SCHOOL DISTRICT POLICIES & PROCEDURES

24. The AISD receives federal funds. As such it must follow the requisites of Title VI of the Civil Rights Acts of 1964, 42 U.S.C. 2000d. One policy called FFH (LOCAL) STUDENT WELFARE- FREEDOM FROM DISCRIMINATION, HARASSMENT, AND RETALIATION addresses, among other things, discrimination based upon race. For the purposes of receiving and investigation complaints of discrimination based upon race or nationality, the Title VI Coordinator is the AISD Superintendent of Schools. During all times relevant to the case Dr. Paul Cruz was the Superintendent of Schools for the AISD and the District's Title VI Coordinator. (P-64 – P-67)

25. Dr. Cruz was the Superintendent of the AISD during this time-period and was also the District's Title VI Coordinator. His designees include Dr. Craig Shapiro, the (Former) Associate Superintendent for High School Schools; Mr. Mike Robinson, Principal; Mr. Vincent Trevino, Ms. Susan Leos, Mr. Larry Britton, Ms. Paulette Walls, and Ms. McGraw all Assistant Principals and Mr. Ryan Thomas, Band Director. The District Policy FFH (Local) requires that any AISD District employee who suspects a student has experienced bullying or harassment based upon their race or nationality, or receives information or has knowledge that a student has experienced bullying or harassment based upon their race or nationality *shall* notify the Title VI Coordinator. Additionally, the Title VI Coordinator or their designee must notify the parents of the student who has been bullied or harassed. The complaint must be reduced to writing and an investigation shall immediately begin. It must be completed within 10 business days with a written report filed with the Title VI Coordinator. The parent of the victim must receive a copy of the report and appropriate disciplinary action taken against the perpetrator. Additionally, the parents must receive notice of their right to appeal any decision to the School Board or the United States Department of Education Office of Civil Rights. Dr. Cruz was the Superintendent of the AISD during this time-period and was also the District's Title VI Coordinator. His designees include Dr. Craig Shapiro, the (Former) Associate Superintendent for High Schools; Mr. Mike Robinson, Principal; Mr. Vincent Trevino, Ms. Susan Leos Mr. Larry Britton, Ms. Paulette Walls, and Ms. McGraw, all Assistant Principals, and Mr. Ryan Thomas, Band Director. (P-64 – P-67)

26. The District Policy FFH (Local) requires that any AISD District employee who suspects a student has experienced bullying or harassment based upon their race or nationality, or receives information or has knowledge that a student has experienced bullying or harassment based upon their race or nationality *shall* notify the Title VI Coordinator. Additionally, the Title VI Coordinator or their designee must notify the parents of the student who has been bullied or harassed. The complaint must be reduced to writing and an investigation shall immediately begin. It must be completed within 10 business days with a written report filed with the Title VI Coordinator. The parent of the victim must receive a copy of the report and appropriate disciplinary action taken against the perpetrator. Additionally, the parents must

4

receive notice of their right to appeal any decision to the School Board or the United States Department of Education Office of Civil Rights. (P-64 – P-67)

27. The AISD School Board Policies & Procedures address a number of potential corrective actions including but not limited to a training program for the victim and any perpetrators; a comprehensive education program for the school community; counseling for the victim; counseling for the perpetrator; follow-up inquiries to determine whether new incidents of bullying and harassed based upon race continued to occur; involving students and parents in an effort to improve the school climate; increasing staff monitoring of areas where prohibited conduct has occurred and reaffirming the District's policy of against bullying and harassment based upon race. Plaintiffs all testified they never received notice of their Title VI procedural safeguards.

D. THE SCHOOL DISTRICT WAS ON NOTICE OF THE COMPLAINT THAT CAMRON WAS A VICTIM OF BULLYING AND HARASSMENT BASED UPON RACE

28. In the Fall of 2016 Camron started Bowie High School as a Freshman. Camron's mother complained to Band Director Thomas and Assistant Principal Larry Britton about racial epithets and slurs during band. (Trial Testimony).

29. In November of 2016 the band attended a national competition in Indianapolis. Camron complained to assistant principal Larry Britton about racial slurs, use of the N-word and other "racial language". (Trial Testimony).

30. In the Fall of 2016 Mrs. Parks-Sneed went to the FFA farm with Camron and heard a boy named Joseph say "Fuck that nigga," and then "I'm so fucking mad I could kill a nigger." Mother spoke with the FFA Instructor, Pierce who stated "he didn't believe the Administrators would do anything about it." (Trial Testimony).

31. Shortly thereafter in 2016, there was a parent meeting with Ms. Leos, the then Principal and Mr. Trevino, the Assistant Principal and mother spoke about the racist language and offensive behaviors she witnessed. (Trial Testimony, P-2).

32. The use of racial epithets continued. Students Coleman, Justin, Joseph, Collin and Ryan would say *Nigger* around Camron all the time. On occasions when she and her mother were together they would often exaggerate the sound of "*Niggaaaaa*" and also mutter "black bitches" and "*fucking niggers*". Camron's mother complained to both Black and Pierce (ag teachers) who promised that they would speak with Administrators. (Trial Testimony, P-4, P-5, P-97).

33. In the Spring of 2017 the Band held an award banquet. Camron received the *Sass quatch Award* supposedly because she was *sassy*. Band Director Thomas approved the naming of the award. Her parents later spoke with Principal Mike Robinson, about this incident and previous concerns with the use of racist language with the band but there was no follow up. (P-59, Trial Testimony).

5

34. In the Fall of 2017 there were two new teachers for the FFA class, Amber Dickinson and Shelby Stephens. Camron was the only African-American student in the program. The word *Nigger* was used on a daily basis in class and on the farm. Also on daily basis when Camron came to class, Kylee R., Will G., Collin P. or Ryan would change the music playing from country to rap, and every time the word *Nigger* came up they would purposefully blast that word. It was heard by Ms. Dickinson. On the farm, students also blasted music accenting the phrase *Nigger* when Camron was present. Mother complained to Principal Robinson about concerns about her safety, as well as her equipment and animals. (Trial Testimony, P-4, P-5, P-6)

35. Around Halloween 2017 Camron saw a white feedbag, stuffed to look like a head was tied and around the neck and was hanging in the FFA Barn. In fact an image of a noose was sent around the school via social media. Camron told her mother who complained to Leos and Robinson. Her parents met with both and her Father complained that the boys were still using the term *Nigger* around Camron and his wife. Later in a phone call mother also told Robinson these same students were dragging trash and purposefully putting it by Camron's feed area for the pigs. Also, that when the noose was cut down it was put back by her feed troughs, so Camron put it in the trash. The students then took it out of the trash and put it back by her trough again. Mother also complained to Dr. Shapiro, PhD the Associate Superintendent for High Schools. Mr. Robinson did apologize about things being racially motivated. (Trial Testimony, P-7).

36. In late 2017 the daily racial slurs in FFA continued. Will. G., a student, commented to Camron that he had nicknamed an Asian student "*noodle nigger*." Camron complained to Assistant Principal McGraw. Camron's mother sent an email complaint about the interaction with Will and met with the FFA Instructor Dickinson and Principal Robinson. (Trial Testimony). As the complaints did not stop the racial harassment of her daughter by the FFA Students Camron's mother spoke with Dr. Shapiro and also Principal Robinson on numerous occasions. (Trial Testimony, P-10, P-89, P-99).

37. The harassment by the FFA student continued through the entire Fall 2017 and Spring 2018 school year and Camron's parents continued to complain. (Trial Testimony, P-9 through P-39, P-100, P-101).

38. During the entire period Fall 2017 and Spring 2018 students continued to use the term *Nigger* around Camron. Father reported it to both the teacher, Mr. Paxton and Band Director, Thomas numerous times. Camron finally stopped participating in Band after her Sophomore Year because of the daily menu of racist jokes. (Trial Testimony).

39. During the 2018 summer Camron attended an FFA Convention and was called a *Fucking Nigger* by some students. She complained to her teachers. (Trial Testimony)

40. During her sophomore or junior year Camron observed graffiti reading "*NIGGER*" on the wall in the girl's bathroom near the gym and written on a window, as well as similar graffiti in

6

other bathrooms across campus. Staff members knew about the graffiti but it remained up the entire year. (Trial Testimony)

41. On about September 13, [2018], Charles Sneed complained to Camron's teachers and again to Mr. Robinson, that he and his wife were very worried about Camron's safety, as well her property on the Farm and her animals. In fact, someone had carved male genitalia on her feed scoop. They encouraged her not to go on the Farm alone. (Trial Testimony, P- 43). The next night a former student named Kylee came to the Farm and vandalized Camron's feed trough, the feed scoop, carved a penis on her farm equipment and injured her show animal. (Trial Testimony).

42. In the Fall of 2018 Camron's mother complained to School Board Member, Yasmin Wagner. She detailed the past complaints of racial harassment that had been provided to administrators, and that she had requested, but had been refused meetings with Dr. Paul Cruz, Superintendent. Ms. Wagner contacted Dr. Cruz and asked for a detailed report about these incidents and the District's response. (Trial Testimony). He referred the issue to Dr. Shapiro, who referred to Principal Robinson who referred it to Assistant Principal Leos. The Sneed's never received the promised review. Camron continued to hear racial epithets by the FFA students on almost a daily basis throughout the entire school year. (Trial Testimony, P- 51, P-52, P-53).

43. Ms. Wagner communicated with Dr. Cruz asking for a detailed report, he referred her concerns back to Dr. Shapiro. Shapiro refers it to Mike Robinson. Robinson referred it to Susan Leos. She never got back with Robinson. He never got back with Dr. Shapiro. He never got back with Dr. Cruz. Dr. Cruz never responded to Board Member Wagner. (p-51 – P-54).

44. If administration had responded, Board Member Wagner would have learned of all the above noted incidents and all the parental complaints. For instance, in the Fall of 2016 mother complained to Principal Leos and Assistant Principal Trevino, that she and Camron were on the Farm and were verbally harassed with violent racial epithets by FFA students, but neither addressed her concerns. (P-3 – P-50). The racial slurs continued to be used by the FFA Students through the year (P-3 – P-58).

45. In January of 2019, a number of FFA Students came to a program at the Travis County Center where Camron was showing some animals. They were wearing military camouflage gear and when they arrived went into the bathroom and put an excessive amount of black shoe polish on their faces. They then came into the main room and not only walked past Camron's parents but purposefully looked at them. Her parents later complained to Robinson about this incident and ongoing concerns. (Trial Testimony, P-56, P-57).

46. In June of 2019, this lawsuit was filed. The racial harassment continued. Camron and her mother complained to her teachers and Principal Robinson. (Trial Testimony, P-58).

47. In Fall 2019, Camron complained to Assistant Principal Paulette Walls that daily racial harassment was continuing in the FFA program and in general. Camron is unaware of any

7

response from administration to that complaint. (Trial testimony).

48. Plaintiffs all testified they never received notice of their Title VI procedural safeguards.

49. On another occasion Robinson told Camron's mother he was sorry about things being racially motivated but that he would have Ms. Leos follow up., but the harassment by FFA students continued. Mother eventually spoke with Dr. Shapiro, PhD the Associate Superintendent for High Schools about this incident and others but he too never formally investigated any of her complaints. (P-8 & 9)

50. Mr. Robinson also never received any specific training for to investigatory allegations of racism and Title VI procedures. None of the complaints he received from Camron or her parents were ever referred to the District's Title VI Coordinator because he stated, he did not believe they were racial. He stated that because Camron did not make the complaints but her mother did, made them less credible. He has never referred a case to the School District's Title VI Coordinator. He did note that the District's Investigatory Procedures required the person who receives a complaint to help the student complete a written complaint form and to gather other evidence but this never happened either for Camron. (P-82).

51. Dr. Cruz reports that the School Board never provided him any training on how to complete a Title VI Investigation and agrees Board Policies require any allegations of discrimination based upon race be referred to him as the District's Title VI Coordinator, but he never received anything from any person with any knowledge of Camron's complaints. He also agreed that Board Policy required a conference with the parent and student, Also, any complaints have a written record of the investigation and outcome, with written follow up, He agreed the District had a duty to provide Camron support and thought Dr. Shapiro had investigated these complaints but wasn't sure if he had. (P-75)

52. Even though mother made multiple complaints to Dr. Shapiro he never separately investigated any. Importantly, he the Associate Superintendent, did not know who was the District's Title VI Coordinator Even though both Cruz and Robinson both looked to him he never received any specific training on how to compete an investigation where there are allegations of racial discrimination, When deposed he agreed the School Board should have done so. Over the years involving this complaint Dr. Shapiro has never been involved in any Title VI Complaints. He too recognized that District policies required that anyone who received a complaint about prohibited behavior had a duty to help the student complete a complaint form and report to report it to the District's Title VI Coordinator. Dr Shapiro stated that any investigation needs to also address the counseling needs of the victim and the perpetrator. He did agree that touching an African-American person's hair is a racially sensitive topic, as is of course using language like "nigger bitch." Further a full investigation should have been completed. Also, any graffiti should have been removed immediately. Nevertheless, and even with all the above while he was unsure if a formal Title VI report was required, certainly after three years of complaints it should have, and did not. (P-75 & P-76)

## **SUMMARY**

53. AISD violated Camron Sneed's rights under Title VI of the Civil Rights Act of 1964.

54. AISD allowed a racially hostile environment.

55. Student on student racial harassment was so severe, pervasive and objectively offensive that it deprived Camron Sneed access to educational opportunities or benefits provided by AISD.

56. AISD had actual knowledge of the ongoing racially hostile environment.

57. Member of AISD administration had actual notice of the racially hostile environment.

58. AISD had control over the students who perpetrated the racial hostility and harassment.

59. Racial hostility and harassment occurred on school grounds.

60. Camron Sneed's family provided multiple times, over 4 years to AISD administrators.

61. AISD had actual knowledge that its efforts to remediate were ineffective; AISD failed to act reasonably in light of the known circumstances.

62. Under the totality of the circumstances, a hostile educational environment existed at Bowie High School.

63. AISD was deliberately indifferent.

64. AISD's violation of Camron Sneed's rights, proximately caused her damage including past and future mental anguish, past and future mental impairment, and economic damages.

Respectfully submitted,
/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
SBN 00783829
FID 21488
Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]

Mr. Anthony O'Hanlon, Esq.
Anthony O'Hanlon, P.C.

SBN 15235520
111 South Travis Street
Sherman, Texas 75090
(903) 892-9133 [Telephone]
(903) 957-4302 [Facsimile]

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing has been forwarded to all parties on this 11th day of November, 2020, in accordance with the Federal Rules of Civil Procedure and the Court's electronic filing system.

ROGERS, MORRIS & GROVER, L.L.P.
Jonathan Brush
jbrush@rmgllp.com
Amy Demmler
ademmler@rmgllp.com
5718 Westheimer, Suite 1200
Houston, Texas 77057
Telephone: 713-960-6000
ATTORNEYS FOR DEFENDANT
AUSTIN INDEPENDENT SCHOOL DISTRICT

                                                            */s/ Martin J. Cirkiel*
                                              Martin Cirkiel, Attorney